THE STATE OF OHIO, APPELLANT, *v.* MEADOWS, APPELLEE.

[Cite as State *v.* Meadows (1986), 28 Ohio St. 3d 43.]

(No. 86-233—Decided October 7, 1986.)

44

*Richard A. Castellini,* city solicitor, *Paul J. Gorman,* city prosecutor, and *Charles F. Dorfman,* for appellant.

*Ferd H. Kleinhaus, Jr.,* county public defender, for appellee.

CELEBREZZE, C.J.  The precise question of law posed by appellant's sole proposition of law is whether the General Assembly's criminalization of mere private possession of materials which show minors participating or engaging in sexual activity, masturbation, or bestiality violates the First Amendment to the United States Constitution, as made applicable to the states by reason of the Fourteenth Amendment. Although the nation's highest court has not entertained this exact issue, that court's pronouncements concerning related settings are germane to the instant cause. We find that "much of the reasoning in these cases is instructive and provides guidance regarding the scope of constitutional restrictions, the competing interests involved, and the attendant public policy con-

cerns." *Gutter* v. *Dow Jones, Inc.* (1986), 22 Ohio St. 3d 286, 288. In light of the constitutional implications and competing societal interests advanced, we believe that Mr. Justice Cardozo's apt observation that "[a] Judge must be a historian and prophet all in one" is descriptive of our task in this unique case.

Clearly, the genesis for a resolution of the instant cause is the decision of *Stanley* v. *Georgia* (1969), 394 U.S. 557. In *Stanley*, Georgia police entered the defendant's home to search for evidence of illegal bookmaking activity. While there, the police found two films in the defendant's desk which depicted obscene matter involving adults. Stanley was arrested, indicted and convicted for knowingly having possession of obscene matter in violation of Georgia law. On appeal, the Supreme Court first recognized that, under its previous interpretations, material which had been determined to be obscene was not protected by the First Amendment. Nevertheless, the Supreme Court reversed the state court judgment by holding that the state could not constitutionally criminalize the mere private possession of obscene material. In striking the state statute, the court's opinion focused on that aspect of the First Amendment which protects individual freedom of thought or ideas:

"It is now well established that the Constitution protects the right to receive information and ideas, 'This freedom [of speech and press] * * * necessarily protects the right to receive * * *.' * * * *This right to receive information* and ideas, regardless of their social worth, see *Winters* v. *New York,* 333 U.S. 507, 510 (1948), *is fundamental to our free society.* Moreover, in the context of this case—a prosecution for mere possession of printed or filmed matter in the privacy of a person's own home—that right takes on an added dimension. For also fundamental is the right to be free, *except in very limited circumstances,* from unwanted governmental intrusions into one's privacy.

"* * *

"These are the rights that appellant is asserting in the case before us. He is asserting the right to read or observe what he pleases—the right to satisfy his intellectual and emotional needs in the privacy of his own home. He is asserting the right to be free from state inquiry into the contents of his library. Georgia contends that appellant does not have these rights, that there are certain types of materials that the individual may not read or even possess. Georgia justifies this assertion by arguing that the films in the present case are obscene. But we think that mere categorization of these films as 'obscene' is insufficient justification for such a drastic invasion of personal liberties guaranteed by the First and Fourth Amendments. Whatever may be the justifications for other statutes regulating obscenity, we do not think they reach into the privacy of one's own home. If the First Amendment means anything, it means that a State has no business telling a man, sitting alone in his own house, what books he may read or what films he may watch. Our whole constitutional heritage rebels

at the thought of giving government the power to control men's minds.' "
(Emphasis added.) *Stanley, supra,* at 564-565.[3]

After *Stanley,* various cases raised the issue of whether this right to
receive information (even of an obscene nature) necessarily created a right
to distribute or deliver obscene matter to another for purposes of his
private possession of such matter. The Supreme Court has consistently re-
jected this notion and limited *Stanley* to its facts. See, *e.g., United States* v.
*Reidel* (1971), 402 U.S. 351; *United States* v. *Orito* (1973), 413 U.S. 139;
*Paris Adult Theatre I* v. *Slaton* (1973), 413 U.S. 49. For example, in
*Reidel, supra,* where the appellant was convicted of using the mail to
*deliver* obscene matter, the court upheld the conviction but noted at 356
that *Stanley* focused on freedom of mind and thought and the privacy of
one's home:

"The personal constitutional rights of those like Stanley to possess
and read obscenity in their homes and their freedom of mind and thought
do not depend on * * * whether obscenity is constitutionally protected.
Their rights to have and view that material in private are independently
saved by the Constitution."

Thus, *Stanley* has always stood for—and still stands for—the proposi-
tion that the state may not, consistent with the First Amendment,
regulate the mere private possession of material in one's own home merely
because it is obscene. However, it is also significant to our inquiry that
Justice Marshall cautioned at fn. 11 of his majority opinion in *Stanley* that
the court *did not* "* * * *mean to express any opinion on statutes making
criminal possession of other types of printed,* filmed, or recorded
*materials."* (Emphasis added.) *Id.* at 568. Rather, it was recognized in the
*Stanley* opinion that *there could be cases involving other subjects where*

---

[3] A consistent view was set forth by Judge Herbert of this court in *State* v. *Mapp* (1960),
170 Ohio St. 427 [11 O.O.2d 169], reversed in *Mapp* v. *Ohio* (1961), 367 U.S. 643 [16 O.O.2d
384]. Nine years before the Supreme Court's decision in *Stanley,* Judge Herbert prophetically
dissented as follows in *Mapp:*

"It is a basic principle that laws restraining the fundamental liberties of the individual
must have as their foundation a broad basic public need which overshadows the rights of the
individual. While we agree that the dissemination of obscene literature such as that produced
in evidence in the present case is and should be against public morals and policy if for no
other reason than that the immature mind which might be exposed to it could be greatly
harmed, I cannot agree that mere private possession of such literature by an adult should
constitute a crime. The right of the individual to read, to believe or disbelieve, and to think
without governmental supervision is one of our basic liberties, but to dictate to the mature
adult what books he may have in his own private library seems to the writer to be a clear in-
fringement of his constitutional rights as an individual. Does the state have the power to pro-
hibit the possession of chemistry books because from such books one might learn how to
make a bomb or poisonous gas? Is the possession of medical books by a layman to be banned
because of the possibility that he might learn about abortion and perhaps put such knowledge
to use?" *Id.* at 437.

See, also, Part I of Justice Harlan's dissenting opinion in *Mapp* v. *Ohio, supra,* at
672-677, and Justice Stewart's memorandum at 682.

"'* * * compelling reasons may exist for overriding the right of the individual to possess those materials." (Emphasis added.) *Id.* Appellant herein argues that the state's interests in this instance constitute the "compelling reasons" or "limited circumstances" envisioned by the *Stanley* court as justifying government intrusion.

It is notable that in *Stanley* the state of Georgia unsuccessfully asserted, *inter alia,* its rights to protect the individual possessor's mind from the effects of obscenity and to prevent future deviant sexual behavior linked to exposure to obscene materials. *Id.* at 565-566. If appellant herein was raising the same interests, our query would be over because we could simply apply the solid notions of individual liberty set forth in the *Stanley* decision to this set of circumstances.[4]

However, in the instant case the state argues that Ohio's Legislature is justified in barring possession of materials which visually depict minors engaging in sexual activity because society's interest in safeguarding the privacy and physical and psychological well-being of its children is paramount.

Because of the great respect historically accorded to free speech, it is essential that we ascertain the precise nature of the state's interest in protecting its children. Our task, then, is to ascertain if these interests are compelling and, if so, whether they also outweigh the fundamental right to be left alone in one's home which was so clearly articulated in *Stanley* et al.

To aid in our understanding of the state's impetus for the eradication of child pornography through the banning of its possession, as well as the competing interests involved, we turn to the more recent Supreme Court pronouncement in *New York* v. *Ferber* (1982), 458 U.S. 747.[5] Against a

---

[4] In our view, the utterly loathsome nature of this material, standing alone, would not provide justification for the state's incursion in this case. The question of whether this criminal statute is unconstitutional does not depend simply on the categorization of this material as child pornography as opposed to obscene material involving adults. The nature of the *material* was *not* the point in *Stanley.* The point was the nature of the First Amendment *right* to freedom of thought in the privacy of one's home which outweighed Georgia's interest in protecting the viewer. As Justice Harlan stated in his concurrence in *United States* v. *Reidel, supra,* at 360, *Stanley* preserves the fundamental "right to a protective zone ensuring the freedom of a man's inner life, be it rich or sordid." Our task today is to balance this important First Amendment freedom with the state's admitted interest of protecting its children from the shocking injuries caused by the sexual abuse of children which the state insists will occur if possession of child pornography is countenanced by the law.

[5] A number of other lower court decisions are of guidance but do not involve the mere private possession of child pornography in the home. For example, in *People* v. *Spargo* (1982), 103 Ill. App. 3d 280, 431 N.E. 2d 27, the defendant was convicted of *exhibiting* child pornography to another. Spargo had showed pictures of nude boys to an undercover policeman while they were seated in Spargo's car. Spargo contended that, pursuant to *Stanley,* the state could not punish private non-commercial dissemination or exhibition of child pornography. The court rejected this contention in stating at 285 that "whatever constitutional protections

backdrop of public indignation over the proliferation of child pornography, the *Ferber* court *defined a new category of unprotected speech.* In contrast to *Stanley, Ferber* dealt specifically with child pornography, not obscenity involving only adults, and upheld the constitutionality of a criminal statute outlawing the *promotion* of sexual performances by minors through the distribution of material depicting such performances. As such, "the Court unanimously upheld a New York criminal statute that bans the distribution of nonobscene material depicting sexual conduct by children."[6] The decision essentially holds that states *can* constitutionally define the visual depiction of sexual conduct by children as obscenity without having to satisfy the threshold constitutional test for determining whether the material is obscene. The court ruled that the state's "compelling" interest in eliminating child pornography was sufficiently great to allow the states to bypass the test for adult obscenity stated in *Miller* v. *California* (1973), 413 U.S. 15. Henceforth, states may automatically declare such visual

---

*Stanley* confers were relinquished by * * * [Spargo] when he removed the child pornography from the confines of his own home and exhibited it to another." The court also noted at 284 that the Supreme Court cases were "consistent in their interpretation of *Stanley* as protective *only of the right to possess obscene* material in one's own home." (Emphasis added.)

Similarly, in *People* v. *Godek* (1982), 113 Misc. 2d 599, 449 N.Y. Supp. 2d 428, defendant was charged with *promoting* an obscene sexual performance by a child. In this case the defendant brought with him to a hotel room some of the items in his own collection of child pornography material in order to give it to another, who turned out to be a customs inspector. The court found *Stanley* inapplicable to protect the defendant, who was promoting this material outside his home. The court stated that such private *exchanges* of child pornography outside the home were not shielded by *Stanley*. See, also, *United States* v. *Hale* (C.A. 9, 1986), 784 F. 2d 1465.

A somewhat closer scenario was presented by the recent case of *United States* v. *Miller* (C.A. 11, 1985), 776 F. 2d 978, certiorari denied (1986), ___ U.S. ___, 90 L. Ed. 2d 201. In *Miller* the defendant ordered a booklet from Europe which depicted children engaged in sexual conduct. He picked it up at his post office box and then took it home. He was thereafter arrested and convicted under a federal statute which outlaws the knowing receipt of child pornography through the mail. Miller contended that, under *Stanley*, he had a right to receive such pornography for his own use. Again, this contention was rejected on grounds that *Stanley* was strictly limited to the mere private possession of such material in the defendant's own home. Since Miller was outside his home when he received the pornography, the court distinguished *Stanley* and upheld his conviction, noting at 981 that the crime was complete before the material ever reached the defendant's home.

Consistent with the foregoing, it can be safely said that the state may permissibly criminalize the promotion, production, preparation, distribution, sale, exchange, delivery, dissemination or exhibition to others (for commercial or non-commercial purposes) of child pornography. The government may further punish the knowing receipt of such material through the mail. *Stanley* draws a line, at the front door of the home, and holds that the state may not constitutionally cross that line to outlaw the mere private possession of *obscene matter* without showing an intent to distribute it to others unless other compelling state interests, not advanced in *Stanley*, justify the intrusion. The unanswered question squarely presented by the instant cause is whether the state may cross the threshold when possession of *child pornography* is criminalized.

[6] Chayes, The Supreme Court, 1981 Term (1982), 96 Harv. L. Rev. 4, 141 *et seq.*

depictions of sexual conduct by minors to be obscene and, as such, unprotected by the First Amendment. The *Ferber* court did not consider the propriety of state criminal sanctions concerning the final stage of the child pornography cycle, *i.e.,* private possession. Nevertheless, the decision does touch on the competing interests involved in this case; the court's discussion of the state's goals is instructive. In recognizing New York's "compelling" interest of safeguarding the physical and mental well-being of its children, the court explained that "[t]he prevention of sexual exploitation and abuse of children constitutes a government objective of surpassing importance." *Id.* at 757.

In this vein, the *Ferber* court set forth a number of important and legitimate state objectives accomplished by the eradication of child pornography. For instance, the court observed that "[t]he legislative judgment, as well as the judgment found in the relevant literature, is that the use of children as subjects of pornographic materials is harmful to the physiological, emotional and mental health of the child." *Id.* at 758.[7] The *Ferber* court found that the existence of photographs "depicting sexual activity by juveniles is intrinsically related to the sexual abuse of children in at least two ways. First, the materials produced are a permanent record of the children's participation and the harm to the child is exacerbated by their circulation. Second, the distribution network for child pornography must be closed if the production of material which requires the sexual exploitation of children is to be effectively controlled." *Id.* at 759.

The court also discerned that state efforts directed at the banning of production would not adequately solve the dilemma. The hidden reality of the child pornography industry makes it "difficult, if not impossible, to halt the exploitation of children by pursuing only those who produce * * *." *Id.* at 759-760. In this regard, we note that the possessor's desire to maintain depictions of child abuse also "provide[s] an economic motive for and * * * [is] thus an integral part of the production of such materials, an activity illegal throughout the Nation." *Id.* at 761. A flourishing home market for such abusive materials will help guarantee that there will be additional victimization of children. Cf. *id.* at 761-762, fn. 13.

Against these substantial overriding interests we believe that, like the promotion stage of the child pornography cycle addressed in *Ferber,* the value of permitting possession of "photographic reproductions of children

---

[7] The *Ferber* court at 758, fn. 9, explained, *inter alia,* as follows:

"* * * It has been found that sexually exploited children are unable to develop healthy affectionate relationships in later life, have sexual dysfunctions, and have a tendency to become sexual abusers as adults. [Citations omitted.] * * * [S]exually exploited children [are] predisposed to self-destructive behavior such as drug and alcohol abuse or prostitution * * *. [Citations omitted.] Sexual molestation by adults is often involved in the production of child sexual performances. [Citation omitted.] When such performances are recorded and distributed, the child's privacy interests are also invaded."

engaged in lewd sexual conduct is exceedingly modest, if not *de minimis.*" *Id.* at 762.

Unlike the obscene materials considered in *Stanley, Miller,* et al., child pornography involves, by its nature, the physical, mental and sexual abuse, seduction and harmful exploitation of children. The depictions sought to be banned by the state are but memorializations of cruel mistreatment and unlawful conduct. Additionally, such material would continue to exploit and victimize the children shown by haunting them in the future. *Ferber* at 759, fn. 10.[8] We believe the interests of the state in protecting the privacy, health, emotional welfare and well-rounded growth of its young citizens, together with its undeniable interest of safeguarding the future of society as a whole, comprise exactly the type of "compelling reasons" justifying a "very limited" First Amendment intrusion envisioned by the *Stanley* court. At the same time, the cost to the individual possessor's right of free speech, privacy and thought, caused by the state's banning of visual mementos from an episode of sexual abuse of a child, is slight. Moreover, the content value of such material is trifling and alternative means of simulation exist.[9]

---

[8] It is significant that the purposes behind the obscenity doctrine bear no connection to the tragic injuries resulting from child pornography. The *Ferber* court at 759, fn. 10, noted as follows:

"* * * As one authority has explained:

" '[P]ornography poses an even greater threat to the child victim than does sexual abuse or prostitution. Because the child's actions are reduced to a recording, the pornography may haunt him in future years, long after the original misdeed took place. A child who has posed for a camera must go through life knowing that the recording is circulating within the mass distribution system for child pornography.' Shouvlin, Preventing the Sexual Exploitation of Children: A Model Act, 17 Wake Forest L. Rev. 535, 545 (1981).

"See also Child Exploitation 292 ('[I]t is the fear of exposure and the tension of keeping the act secret that seem to have the most profound emotional repercussions'); Note, Protection of Children from Use in Pornography: Toward Constitutional and Enforceable Legislation, 12 U. Mich. J. Law Reform 295, 301 (1979) (hereafter cited as Use in Pornography) (interview with child psychiatrist) ('The victim's knowledge of publication of the visual material increases the emotional and psychic harm suffered by the child').

"Thus, distribution of the material violates 'the individual interest in avoiding disclosure of personal matters.' *Whalen* v. *Roe,* 429 U.S. 589, 599 (1977). Respondent cannot undermine the force of the privacy interests involved here by looking to *Cox Broadcasting Corp.* v. *Cohn,* 420 U.S. 469 (1975), and *Smith* v. *Daily Mail Publishing Co.,* 443 U.S. 97 (1979), cases protecting the right of newspapers to publish, respectively, the identity of a rape victim and a youth charged as a juvenile offender. Those cases only stand for the proposition that 'if a newspaper lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication, of the information, absent a need * * * of the highest order.' *Id.,* at 103."

[9] In this regard, the *Ferber* majority noted as follows at 762-763:

"We consider it unlikely that visual depictions of children performing sexual acts or lewdly exhibiting their genitals would often constitute an important and necessary part of a literary performance or scientific or educational work. As a state judge in this case observed, if it were necessary for literary or artistic value, a person over the statutory age who perhaps

Ohio's General Assembly has determined that it is necessary to prohibit possession of such materials in order to halt sexual exploitation and abuse of children.[10] It is not our role to pass judgment on whether the legislature has chosen the best course to effect its admittedly admirable goal of combating child pornography. As the *Ferber* court stated, "[w]e shall not second-guess this legislative judgment." *Id.* at 758. Rather, our sacred mandate is to ascertain whether the state's chosen method runs afoul of, or unnecessarily intrudes on, constitutionally protected First Amendment rights.

"It must be presumed that the legislature, in the enactment of this law, had in mind * * *" the constitutional provision and restrictions involved and only intended to enact legislation which is in accordance with its power. *State, ex rel. Bailey,* v. *George* (1915), 92 Ohio St. 344, 346. "* * * When an enactment of the General Assembly is challenged, the challenger must overcome a strong presumption of constitutionality." *State, ex rel. Jackman,* v. *Ct. of Common Pleas* (1967), 9 Ohio St. 2d 159, 161 [38 O.O.2d 404]. As Justice Locher replied in *State* v. *Dorso* (1983), 4

---

looked younger could be utilized. Simulation outside of the prohibition of the statute could provide another alternative. Nor is there any question here of censoring a particular literary theme or portrayal of sexual activity. The First Amendment interest is limited to that of rendering the portrayal somewhat more 'realistic' by utilizing or photographing children."

[10] A number of our sister states have enacted comparable provisions. For example, as a result of studies conducted by the state of Florida's Child Care Task Force, eight bills targeted at physical and sexual abuse of children became law, including a bill "which deals with child pornography and provides penalties for possession of certain items." Comment, (1985), 13 Fla. St. U.L. Rev. 633, 634, at fn. 10.

Fla. Stat. Section 827.071(5), effective October 1, 1985, provides as follows:

"It is unlawful for any person to knowingly possess any photograph, motion picture, exhibition, show, representation, or other presentation which, in whole or in part, he knows to include any sexual conduct by a child. Whoever violates this subsection is guilty of a felony of the third degree * * *."

See, also, *e.g.,* Ala. Code Section 13A-12-192(b) which provides as follows:

"Any person who knowingly possesses any obscene matter containing a visual reproduction of a person under the age of 17 years engaged in any act of sado-masochistic abuse, sexual intercourse, sexual excitement, masturbation, genital nudity, or other sexual conduct shall be guilty of a Class C felony."

Similarly, Ill. Stat., Ch. 38, Section 11-20.1(a) states:

"A person commits the offense of pornography who:

"* * *

"(2)  with the knowledge of the nature or content thereof, reproduces, disseminates, offers to disseminate, exhibits or possesses any film, videotape, photograph or other similar visual reproduction of any child whom the person knows or reasonably should know to be under the age of 18 engaged in [specified sexual activities] * * *."

Cf. *People* v. *Crowell* (Ill. App. 1986), 495 N.E. 2d 1223, fn. 1 (Effective November 18, 1985, "[s]ection 11-20.1 has been amended extending *child pornography protection* to children under the age of 18 and adding possession of child pornography to the list of criminal conduct in paragraph [2]."). (Emphasis added.)

Ohio St. 3d 60, 61, "courts must apply all presumptions * * * so as to uphold, if at all possible, a statute or ordinance assailed as unconstitutional." (Followed in *Kettering* v. *State Emp. Relations Bd.* [1986], 26 Ohio St. 3d 50, 52.)

In recognition of our discussion above, the presumption of constitutionality which blankets legislative enactments, and in light of the Supreme Court's admonition in *Ferber* at 756 that the "States are entitled to greater leeway in the regulation of pornographic depictions of children," we conclude that the competing public policy and constitutional concerns tilt decidedly in favor of sustaining this statute.

Consistent with our understanding of the Supreme Court's pronouncements in *Stanley* and *Ferber,* and based on the foregoing opinion, we hold that R.C. 2907.322(A)(5), which prohibits the knowing possession or control of material which shows a minor participating or engaging in sexual activity, masturbation, or bestiality, does not violate the First Amendment to the United States Constitution, as made applicable to the states by the Fourteenth Amendment. Ohio's compelling state interests of preserving its children's privacy and protecting them from the cruel physiological, mental, and emotional abuse caused by sexual seduction, exploitation, and mistreatment occasioned by child pornography, outweigh appellee's interest in possessing such visual depictions.

Accordingly, we reverse the judgment of the court of appeals and reinstate the judgment of the trial court.

*Judgment reversed.*

SWEENEY, LOCHER and C. BROWN, JJ., concur.

HOLMES, DOUGLAS and WRIGHT, JJ., separately concur in the syllabus and judgment.

C. BROWN, J., concurs separately.

HOLMES, J., concurring.   I fully agree with the result as well as with the reasoning in the majority opinion. However, I write separately to make several observations regarding the applicable legal standard. I would also add several reasons why the act of privately possessing photographic child pornography is inimical to society's legitimate and recognized interests.

It should be emphasized that *Stanley* v. *Georgia* (1969), 394 U.S. 557 recognized in the facts of that case that a combination of constitutional rights were infringed.[11] Consequently, the *Stanley* court was required to

---

[11] See, *e.g.,* Comment, *Karalexis* v. *Byrne* and The Regulation of Obscenity: "I am Curious (*Stanley*)" (1970), 56 Va. L. Rev. 1205; Note, The Supreme Court, 1968 Term, Private Possession of Obscene Material (1969), 83 Harv. L. Rev. 147.

fashion a compound resolution which was partly First Amendment analysis and partly the "added dimension" of Fourth Amendment privacy principles. *Id.* at 564. The court's First Amendment inquiry was plainly along the lines of the clear and present danger test,[12] and was a significant departure from the standard set forth in *Roth* v. *United States* (1957), 354 U.S. 476, 486-487 [14 O.O.2d 331]. The state's interest in controlling obscenity, which seemed sufficient in *Roth,* was, in *Stanley,* insufficient without any greater countervailing state interest. The later reaffirmation of *Roth,* see, *e.g., United States* v. *Thirty-seven Photographs* (1971), 402 U.S. 363, demonstrated that the *Stanley* decision flowed not so much from the content of the material as the fear of consequences which might flow from the privacy intrusion.

There was no justifiable state interest where there was no provable connection between the act of possession and crimes of sexual violence. Nor was there any demonstrable victimization to the participants in production, dissemination, or consumption of obscenity. Although "* * * the circumstances that would make the clear and present danger test applicable were not present,"[13] *Stanley* reserved power to regulate private use and private possession where the state demonstrates a substantial and subordinating state interest.[14] See, *e.g., Ginsberg* v. *New York* (1968), 390 U.S. 629 [44 O.O.2d 339].

In *New York* v. *Ferber* (1982), 458 U.S. 747, child pornography was described as "not entitled to First Amendment protection." *Id.* at 765. More significantly, *Ferber* allowed the state to regulate production and distribution of child pornography without proof of obscenity.[15] The material need only visually depict a child, below a certain age, engaged in sexual conduct, which conduct, as in the Ohio statute, was specifically defined. *Id.* at 761.

While not bearing upon the issue of possession, *Ferber* stated the

---

Comment, Still More Ado About Dirty Books (and Pictures): *Stanley, Reidel,* and *Thirty-seven Photographs* (1971), 81 Yale L.J. 309, 310 (hereinafter referred to as "More Ado").

See, generally, Comment, Private Morality and The Right to Be Free: The Thrust of *Stanley* v. *Georgia* (1969), 11 Ariz. L. Rev. 731; Note, Constitutional Law—First Amendment: The *New* Metaphysics of the Law of Obscenity, *Stanley* v. *Georgia* (1969), 57 Cal. L. Rev. 1257.

[12] Engdahl, Requiem for Roth: Obscenity Doctrine Is Changing (1969), 68 Mich. L. Rev. 185, 200 (hereinafter referred to as "Requiem").

[13] Requiem at 200-201.

[14] More Ado, *supra,* at 329-331.

[15] See, generally, Comment, First Amendment—Nonobscene Child Pornography and Its Categorical Exclusion From Constitutional Protection (1982), 73 J. of Crim. Law & Criminology 1337; Note, Constitutional Law—Child Pornography and the First Amendment: Abrogation of the Obscenity Doctrine in *New York* v. *Ferber* (1983), 16 Creighton L. Rev. 509.

unanimous belief of the court that child pornography is nothing less than the evil sexual exploitation of children with demonstrable harm to their later lives and which justifies fully the state's interest in regulating child pornography. *Id.* at 757-759. Moreover, the *Ferber* court specifically concluded that: prevention of sexual exploitation of children is a governmental objective of surpassing importance; banning production only does not adequately address the problems posed by a permanent record of the child's participation and the incentive to produce posed by circulation of the material; selling and advertising child pornography "provide an economic motive for and are thus an integral part of the production of such materials"; the cost to free speech resulting from a ban of child pornography is slight; and content-based classification is permissible when the evil to be restricted "so overwhelmingly outweighs the expressive interests, if any, at stake, that no process of case-by-case adjudication is required."[16] *Ferber, supra,* at 756-764.

The act of privately possessing photographic child pornography is so inimical to society's legitimate and recognized interests that a state may constitutionally intrude on those First Amendment and privacy interests set forth in *Stanley*. Initially, child pornography has several noticeable similarities to contraband drugs, for which possession is also an offense. When drugs are illegally possessed and used, the primary victim is the consumer. Yet the state correctly punishes everyone in the chain for the crime of possession, including the distributor, manufacturer and victim-possessor. There is no logical difference whether the admitted victimization occurs during the production or consumption phase of the process. So also should the state have power to regulate photographic child pornography. Since it is so unlike literature as to possess mere *de minimis* literary value, its entire chain of possession ought reasonably to be subject to sanction.

The purchaser of child pornography who gives money in exchange for this procured misery is a vital part of the production-distribution system. Such knowing actions give him equal guilt with the procurer, the producer and the distributor. Those who purchase or seek out such materials are at the very core of the problem by knowingly creating a demand for the abuse. It is his ultimate enjoyment of the perverse and harmful acts recorded that fuels the entire industry.

There is nothing in the mere existence of contraband under one's private control which creates a need for governmental regulation. Instead, it is the subsequent use to which these items are put after possession and the potential for grave harm flowing from such use which justify the regulation.

One of the primary uses of child pornography is for the systematic

---

[16] Note, The Supreme Court, 1981 Term, Freedom of Speech and Association (1982), 96 Harv. L. Rev. 141, 143-144.

desensitization, as part of an insidious process, to induce children to engage in the acts depicted.[17] Apparently the largest amount of child molestation is committed in local communities to feed the "informal cottage industry" which is only partly operated for profit.[18] Once a youngster is selected, child pornography is utilized to systematically reduce his inhibitions through calculated exposure to varying degrees of the material. "* * * After the child's anxiety to the material has been reduced, the pedophile can convince him to participate and be photographed. The child, after having seen 'all the other kids do it' and being reassured by a trusted adult friend, will participate in sexual conduct with the pedophile. The pedophile needs the child pornography * * * to facilitate the seduction of other children."[19] Child pornography, with the same techniques, is also used to induce children into child prostitution.[20] Consequently, child pornography is a gravely harmful instrumentality.

Laws banning production and distribution are insufficient to halt this abuse of children. " 'The act of selling these materials is guaranteeing that there will be additional abuse of children.' " *Ferber, supra,* at 761, fn. 13. It is not enough to pursue the producers and distributors since most of their activities have been forced underground. See *id.* at 760, fn. 11.

Most readily apparent is that the Ohio statute is not at all concerned with the effect of child pornography, as visual stimulus, on the possessor. Furthermore, it is irrelevant whether society is offended by the idea so transmitted, for the written word is not the subject of this law. By comparison, the privacy interests set forth in *Stanley,* and acted upon in *Ferber,* are not nearly so weighty as the clear and present danger posed by the increased activity in child pornography production with its accompanying child molestation and rape.[21] These are direct and perceivable harms which directly result from the ability to possess the depictions of such acts. This, I believe, is a significant and subordinating state interest sufficient to justify and uphold the constitutionality of the statute at issue under the standards announced in *Stanley, supra,* and *Ferber, supra.*

LOCHER, J., concurs in the foregoing concurring opinion.

---

[17] See, *e.g.,* Shouvlin, Preventing the Sexual Exploitation of Children: A Model Act (1981), 17 Wake Forest L. Rev. 535 (hereinafter referred to as "Exploitation"); Note, Child Protection Act of 1984, Enforceable Legislation to Prevent Sexual Abuse of Children (1985), 10 Okla. City U. L. Rev. 121 (hereinafter referred to as "Child Protection").

[18] Child Protection, *supra,* at 133, fn. 60.

[19] *Id.* at 133.

[20] *Id.* See, also, Exploitation, *supra,* at 544.

[21] Exploitation, *supra,* at 535.

DOUGLAS, J., concurring in the syllabus and judgment only. Appellee argues that obscenity and child pornography should be accorded the same treatment and, as such, mere private possession of child pornography may not be constitutionally proscribed. I do not agree. It is my judgment that child pornography is a separate category of unprotected speech and that banning private possession of depictions of children engaged in sexual acts does not require, as a condition precedent, a finding that such material is obscene. This conclusion is supported by the fact that although R.C. 2907.321(A)(5) prohibits the possession of material involving a minor *if* the material is obscene, R.C. 2907.322(A)(5), the statutory violation charged herein, prohibits the possession of material depicting minors involved in specified acts, with no mention of the word obscenity.[22] The apparent rationale for this distinction is that in addition to those recognized state interests which support the regulation of obscenity, even stronger independent state interests exist which justify state regulation in the area of child pornography. That is, the state certainly has an overriding interest in protecting its children from debauchery, exploitation and sexual abuse, for solely economic purposes and perverse sexual gratification. These additional and different interests require this court to perform a separate balancing test. This test is different from that used by courts deciding the constitutionality of state laws prohibiting possession of adult pornography.

The very act of *creating* child pornography, in and of itself, is an abuse of children. Governmental authority to prevent child abuse certainly implies the authority to destroy the purely economic incentive to film the abuse itself, that incentive being the desire of the deviant to possess films of the sexual exploitation of children. As constitutional law expert and scholar Professor Laurence H. Tribe stated when addressing this issue[23]:

"Given the great difficulty of directly enforcing laws against the crimes being filmed (especially if faces are concealed), and given the lack of any economic incentive to commit such crimes *apart* from the market for films of their commission (contrast films of bank robberies, say), it seems insufficient to reply that government must pursue the less restric-

---

[22] R.C. 2907.321(A)(5) reads:

"(A) No person, with knowledge of the character of the material or performance involved, shall do any of the following:
"(* * *
"(5) Possess or control any *obscene* material, that has a minor as one of its participants; * * *" (Emphasis added.)

R.C. 2907.322(A)(5) reads:

"(A) No person, with knowledge of the character of the material or performance involved, shall do any of the following:
"(* * *
"(5) Possess or control *any material* that shows a minor participating or engaging in sexual activity, masturbation, or bestiality; * * *" (Emphasis added.)

[23] Tribe, American Constitutional Law (1978) 666, Section 12-16, fn. 62.

tive alternative of prosecuting the underlying crimes rather than prosecuting the filmmaker *or indeed confiscating the film.*" (Emphasis added in part.)

While I agree with the judgment of the majority in this case, I arrive at my conclusion for different reasons.

The facts in this case are clear: the appellee was in his hotel room, his lawful residence, and in his room were magazines and a picture which depicted children engaged in sexual activity. The children depicted were "minors" within the meaning of R.C. 2907.322, and the magazines were in the private possession and control of the appellee as proscribed by the statute. There is no evidence, direct or indirect, that appellee sold, produced or disseminated the subject magazines, or that he participated in any activity that would provide grounds to broaden the allegations set forth in the complaint.[24]

In his motion to dismiss, appellee limited his constitutional attack upon the statute to the language in R.C. 2907.322(A)(5), which prohibits mere possession of sexually oriented material involving a minor. Appellee *stipulated* that the publications were unlawful in nature, *viz.*, that they portray minors engaged in sexual activity. Accordingly, no question is raised as to whether the materials are in fact obscene.

Appellee contends that the decision of the United States Supreme Court in *Stanley* v. *Georgia* (1969), 394 U.S. 557, is determinative of the outcome of this case. In *Stanley,* the state of Georgia sought to impose criminal sanctions in a case involving mere possession of obscene materials depicting adults engaged in sexual activities. The court in that case held at 568:

"We hold that the First and Fourteenth Amendments prohibit making mere private possession of obscene material a crime."

Appellant herein challenges the relevance of the *Stanley* court's holding, however, because in the case *sub judice,* the subject materials involved minor children. Appellant contends that *child* obscenity or pornography was not addressed by the Supreme Court until some thirteen years later in the case of *New York* v. *Ferber* (1982), 458 U.S. 747. Appellant urges that *Ferber* provides the law applicable to this case. In *Ferber,* the state's petition for certiorari was granted to decide the single question:

"To prevent the abuse of children who are made to engage in sexual conduct for commercial purposes, could the New York State Legislature, consistent with the First Amendment, prohibit *the dissemination* of

---

[24] Appellant states in its brief:

"What is beyond question is that the Defendant did nothing more than possess within his home one or more magazines which depicted minors of unspecified age or sex, engaging in sexual activity. There is no indication, directly or by innuendo, that Meadows sold, produced, or disseminated the material possessed by him or participated in any activity that would broaden the accusation set forth in the Complaint."

material which shows children engaged in sexual conduct, *regardless of whether such material is obscene?*" (Emphasis added.)

The Supreme Court answered this question affirmatively. But appellee challenges the applicability of the pronouncements of the *Ferber* court, because the case does not address the constitutionality of a statute banning *private possession* of child pornography. I conclude that both cases provide guidance in deciding the question now before us, to wit: Whether R.C. 2907.322(A)(5), insofar as it makes criminal mere private possession of material that shows a minor participating in sexual activity, is violative of the First Amendment.

Although our "right to receive information and ideas, regardless of their social worth * * * is fundamental to our free society," *Stanley, supra,* at 564; *Winters* v. *New York* (1948), 333 U.S. 507, 510, not all speech is protected. See, *e.g., Schenck* v. *United States* (1919), 249 U.S. 47, establishing the "clear and present danger" doctrine which renders unprotected, advocacy which incites to violence or illegal conduct; *Chaplinsky* v. *New Hampshire* (1942), 315 U.S. 568, 572, holding as unprotected speech " 'fighting' words," "which by their very utterance inflict injury or tend to incite an immediate breach of the peace"; *Beauharnais* v. *Illinois* (1952), 343 U.S. 250, 266, holding that libel is not in the area of constitutionally protected speech. It is also true that relative to legislation in the area of sexually explicit material, obscenity is not within the contemplation of our First Amendment freedoms. *Roth* v. *United States* (1957), 354 U.S. 476, 485 [14 O.O.2d 331].

What is or is not obscenity is determined by application of the three-part test enunciated by the United States Supreme Court in *Miller* v. *California* (1973), 413 U.S. 15, 24:

" * * * (a) whether 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest * * * ; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value."

It is well-established that the states retain broad power to regulate obscenity. *Stanley, supra,* at 568. The Supreme Court has recognized the states' interest in avoiding the danger that obscene materials will fall into the hands of children, *Ginsberg* v. *New York* (1968), 390 U.S. 629 [44 O.O.2d 339], and the states' interest in making sure that obscene materials do not intrude upon the sensibilities or privacy of the general public, *Redrup* v. *New York* (1967), 386 U.S. 767. The Supreme Court has held that these interests outweigh the First Amendment rights of promoters and distributors of such material. *Miller* v. *California, supra,* at 18-19; *Stanley* v. *Georgia, supra,* at 567; *Jacobellis* v. *Ohio* (1964), 378 U.S. 184, 195 [28 O.O.2d 101].

In explaining why society should be allowed to suppress obscene

material, in contrast to merely protecting the right of a person to avoid it if they wished,[25] the Supreme Court has offered three reasons: (1) "there is at least an arguable correlation between obscene material and crime," *Paris Adult Theatre I* v. *Slaton* (1973), 413 U.S. 49, 58; (2) states "have the power to make a morally neutral judgment" that public exhibition or commerce in obscene material tends to "injure the community as a whole" by polluting the "public environment," *id.* at 68-69; and (3) " 'what is commonly read and seen and heard and done intrudes upon us all, want it or not.' " *Id.* at 59. However, the United States Supreme Court has also said that because a work is obscene does not mean that a state can impose absolute prohibitions. Notwithstanding the reasons cited above, the *Stanley* court stated at 564-565:

" * * * [F]undamental is the right to be free, except in very limited circumstances, from unwanted governmental intrusions into one's privacy. * * * [M]ere categorization of * * * [materials] as 'obscene' is insufficient justification for such a drastic invasion of personal liberties guaranteed by the First and Fourteenth Amendments. *Whatever may be the justifications for other statutes regulating obscenity,* we do not think they reach into the privacy of one's own home." (Emphasis added.)

Clearly, the result of *Stanley* is that, although the states may have interests which outweigh the individuals' right to express, *i.e.,* to disseminate or promote obscenity in public, *these reasons alone* are insufficient to outweigh the individuals' right to receive, *i.e.,* observe or possess in private, obscenity involving adults. The *Stanley* court *did* recognize, however, that where reasons exist, sufficiently compelling in nature, even mere possession of some "types of printed, filmed, or recorded materials" may be proscribed consistent with individuals' First Amendment rights. *Stanley, supra,* at 568, fn. 11. When considering this verbiage from *Stanley,* the holding and explanatory language of the *Ferber* court is significant. It is my belief that *Ferber* sets forth additional, independent state interests which, when balanced against the individual's right to receive, observe, or possess child pornography, tip the scale in the states' favor and provide constitutional authority for the enforcement of R.C. 2907.322(A)(5).

In *Ferber,* the court held at 756-757 that " * * * the States are entitled to greater leeway in the regulation of pornographic depictions of children"[26] because "[i]t is evident beyond the need for elaboration that a

---

[25] See *Rowan* v. *United States Post Office Dept.* (1970), 397 U.S. 728 wherein the Supreme Court upheld a statutory scheme that allowed individuals to exclude unwelcome mail.

[26] The *Ferber* court stated at 764-765 that, "* * * the nature of the harm to be combated [child abuse] requires that the state offense be limited to works that *visually* depict sexual conduct by children below a specified age. The category of 'sexual conduct' proscribed must also be suitably limited and described.

State's interest in 'safeguarding the physical and psychological well-being of a minor' is 'compelling' * * *,'' and, "[t]he prevention of sexual exploitation and abuse of children constitutes a government objective of surpassing importance." (Citations deleted.) Accordingly, legislation aimed at protecting the physical and emotional well-being of children can be sustained even when laws operate in sensitive areas of constitutionally protected rights.[27] In addition, the *Ferber* court recognized that greater regulatory leeway is justified in light of the intrinsic relationship between child pornography and child abuse. First, because "the materials produced are a permanent record of the children's participation and [thus] the harm to the child is exacerbated by their circulation [*id.* at 759]," and second, because "the distribution network for child pornography must be closed if the production of material which requires the sexual exploitation of children is to be effectively controlled." *Id.* Since consumers of child pornography provide the economic incentive for production and distribution of this material, they are an essential *part of* the "distribution network" and should be subject to regulation.

Finally, the *Ferber* court noted, at 761-762, that:

" 'It rarely has been suggested that the constitutional freedom for speech and press extends its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute.' * * * " (Citation deleted.)

Surely, First Amendment guarantees do not extend to speech, which relies for its expression upon the criminal exploitation of children. It is possible that one might question the validity of banning possession of adult obscene materials based upon the link purported to exist between the viewing of adult pornography and the subsequent commission of sex crimes. However, in my judgment, the link to crime and viewing which exists *by virtue of the subjects being filmed,* provides an absolutely convincing rationale for banning child pornography.

The *Ferber* court effectively classified child pornography as a category of speech like obscenity, libel or fighting words which lies outside the protection of the First Amendment.[28] However, that classification, without

---

"* * * We note that the distribution of descriptions or other depictions of sexual conduct, not otherwise obscene, which do not involve live performance or photographic or other visual reproduction of live performances, retains First Amendment protection. * * *" (Emphasis *sic.*)

[27] See, *e.g., Prince* v. *Massachusetts* (1944), 321 U.S. 158, wherein the Supreme Court held that a statute prohibiting the use of a child to distribute religious literature was valid despite the statute's infringement on valid First Amendment activities; and *Ginsberg* v. *New York, supra,* upholding a New York law protecting children from exposure to *non*-obscene literature (for adults) despite the statute's effect on a First Amendment right.

[28] The *Ferber* court at 761 concludes that child pornography may be regulated even though it does not meet the *Miller* test of obscenity. The court stated therein:

"The *Miller* standard, like all general definitions of what may be banned as obscene, does

more, does not accord states the right to prohibit the private possession of this material. As with adult obscenity materials, the First Amendment right to possess and view child pornography must be weighed against the interest of the state in regulating it. It is my judgment that, despite the significant infringement on a fundamental individual right to subject one's self to whatever ideas or expressions one chooses, the interest of this state in protecting the emotional and physical well-being of its children far surpasses the First Amendment rights involved herein. It is the prerogative of this court to send a clear and unequivocal message to everyone involved in child pornography. There is no place for child abuse in a civilized, child-nurturing society, and if you traffic in or even privately possess child pornography in this state, Ohio intends to punish you. As noted by the United States Supreme Court in *Prince* v. *Massachusetts* (1944), 321 U.S. 158, 168:

"A democratic society, rests for its continuance, upon the healthy, well-rounded growth of young people into full maturity as citizens. * * * "

Such must be the position and policy of this state. The state has a compelling interest in seeing that child pornography is eliminated in Ohio. The legislative response, in part, to accomplish this purpose is R.C. 2907.322(A)(5) which proscribes the private possession of material showing a minor participating in sexual activity. For the reasons stated, R.C. 2907.322(A)(5) does not violate the First and Fourteenth Amendments to the United States Constitution.

Accordingly, and for the foregoing reasons, I concur in the judgment of the majority of this court.

WRIGHT, J., concurring. I concur in the judgment and syllabus only as the majority opinion does not come to grips with the alleged invasion of privacy of appellee. The Supreme Court of the United States has declared that child pornography does not enjoy the status of protected free speech. *New York* v. *Ferber* (1982), 458 U.S. 747.[29] This should be a source of com-

---

not reflect the State's particular and more compelling interest in prosecuting those who promote the sexual exploitation of children. Thus, the question under the *Miller* test of whether a work, taken as a whole, appeals to the prurient interest of the average person bears no connection to the issue of whether a child has been physically or psychologically harmed in the production of the work. Similarly, a sexually explicit depiction need not be 'patently offensive' in order to have required the sexual exploitation of a child for its production. In addition, a work which, taken on the whole, contains serious literary, artistic, political, or scientific value may nevertheless embody the hardest core of child pornography. 'It is irrelevant to the child [who has been abused] whether or not the material . . . has a literary, artistic, political or social value.' Memorandum of Assemblyman Lasher in Support of § 263.15. *We therefore cannot conclude that the Miller standard is a satisfactory solution to the child pornography problem.*" (Emphasis added; footnote deleted.)

Thus, it would be irrational to conclude that child pornography is subject to state regulation only on the basis that it is a form of obscene material. Child pornography is simply objectionable on its own.

[29] "When a definable class of material * * * bears so heavily and pervasively on the

fort to all our responsible citizenry. Likewise, the Ohio General Assembly has concluded that this type of material is contraband because it poses a danger to the health and safety of our children. Without equivocation I conclude that R.C. 2907.322(A)(5) is an appropriate exercise of the state's police power under the stipulated facts of this case.[30]

However, I disagree with the majority's holding that the intrusion into appellee's privacy was "slight." I believe that this statute creates a substantial intrusion into an individual's privacy by limiting the visual material he can keep and view in his home. The United States Supreme Court recognized the extent of this intrusion in *Stanley* v. *Georgia* (1969), 394 U.S. 557, 564-565, in which it discussed an individual's fundamental "right to be free, except in very limited circumstances, from unwanted governmental intrusions into one's privacy," and held that prohibition of private possession of written or visual materials in one's own home is a "drastic invasion of personal liberties." Since the court had previously held that "obscenity is not within the area of constitutionally protected speech," *Roth* v. *United States* (1957), 354 U.S. 476, 485 [14 O.O.2d 331], the critical factor in *Stanley* was that the possession was within the privacy of an individual's home. Furthermore, the court has consistently refused to extend this protection to obscenity outside the home. See *Paris Adult Theatre I* v. *Slaton* (1973), 413 U.S. 49. The privacy invasion here is identical to that in *Stanley,* but the visual materials at issue are different.

The most explicit guarantee of privacy is found in the Fourth Amendment which affirms the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The principles reflected in the Fourth Amendment "apply to all invasions on the part of the government and its employees of the sanctity of a man's home and the privacies of life." See *Boyd* v. *United States* (1886), 116 U.S. 616, 630; *Payton* v. *New York* (1980), 445 U.S. 573, 585. Since the alleged intrusion involved activities within appellee's home, his privacy concerns cannot be dismissed without consideration.

However, while I cannot ignore appellee's privacy claims, I believe that any right to privacy that appellee may have in his own home is not absolute. See *Bowers* v. *Hardwick* (1986), 478 U.S. ___, 92 L. Ed. 2d 140. In my view Justice Hugo Black was correct as to the exceptions to and limitations on privacy rights. In his dissent in *Griswold* v. *Connecticut* (1965), 381 U.S. 479, 508-510,[31] he stated:

---

welfare of children engaged in its production, we think the balance of competing interests is clearly struck and that it is permissible to consider these materials as without the protection of the First Amendment." *New York* v. *Ferber, supra,* at 764.

[30] It should be emphasized that our decision is confined to R.C. 2907.322(A)(5) and does not reflect upon the constitutionality of the remainder of R.C. 2907.322.

[31] Although the Constitution does not explicitly mention any right of privacy, *Griswold* v. *Connecticut, supra,* spoke of zones of privacy emanating from penumbras of specific guarantees in the Bill of Rights which prevent government interference into personal deci-

" * * * Strongly as I desire to protect all First Amendment freedoms, I am unable to stretch the Amendment so as to afford protection to the conduct of these defendants * * *.

"The Court talks about a constitutional 'right of privacy' as though there is some constitutional provision or provisions forbidding any law ever to be passed which might abridge the 'privacy' of individuals. *But there is not.* There are, of course, guarantees in certain specific constitutional provisions which are designed in part to protect privacy at certain times and places with respect to certain activities. Such, for example, is the Fourth Amendment's guarantee against 'unreasonable searches and seizures.' But I think it belittles that Amendment to talk about it as though it protects nothing but 'privacy.' To treat it that way is to give it a niggardly interpretation, not the kind of liberal reading I think any Bill of Rights provision should be given. The average man would very likely not have his feelings soothed any more by having his property seized openly than by having it seized privately and by stealth. He simply wants his property left alone. And a person can be just as much, if not more, irritated, annoyed and injured by an unceremonious public arrest by a policeman as he is by a seizure in the privacy of his office or home.

" * * * *I like my privacy as well as the next one, but I am nevertheless compelled to admit that government has a right to invade it unless prohibited by some specific constitutional provision.*" (Emphasis added.)

Thus, while the Fourth Amendment protects the sanctity of the home from governmental intrusion, "otherwise illegal conduct is not always immunized whenever it occurs in the home. Victimless crimes, such as the possession and use of illegal drugs, do not escape the law where they are committed at home." *Bowers* v. *Hardwick, supra,* at 149. *Stanley* itself acknowledged that its holding provided no protection for the possession of drugs, firearms, or stolen goods in the home. *Stanley* v. *Georgia, supra,* at 568, fn. 11. Furthermore, the privacy interest expressed in *Griswold* is not without limitations. Just this past term in *Bowers* v. *Hardwick, supra,* the high court held that privacy protections do not extend to homosexual relationships between consenting adults in the privacy of the home, and declined to take a more expansive view of its authority to discover new fundamental rights imbedded in the Due Process Clause. Therefore, since protection of the home is not absolute, the competing interests involved must be examined. However, before proceeding with this examination, I note that this case does not involve traditional search and seizure issues. The material at issue was obtained with a search warrant, and no questions about the validity of this warrant have been raised.

---

sions in matters of marriage and contraception. See, also, *Zablocki* v. *Redhail* (1978), 434 U.S. 374. The Due Process Clause of the Fourteenth Amendment has also been construed to confer privacy rights to decisions involving procreation, childbirth, and family life. See *Moore* v. *East Cleveland* (1977), 431 U.S. 494; *Carey* v. *Population Services Internatl.* (1977), 431 U.S. 678; *Roe* v. *Wade* (1973), 410 U.S. 113.

The holding in *Stanley* did not extend to "statutes making criminal possession of other types of printed, filmed or recorded materials" (*id.* at fn. 11) and noted that "compelling reasons may exist for overriding the right of the individual to possess those materials" (*id.*). "Compelling" is the key word in this analysis. Regulations infringing on this privacy interest may be justified only by a compelling state interest and must be narrowly drawn to express only those interests. *Carey* v. *Population Services Internatl.* (1977), 431 U.S. 678. Child pornography is dangerous contraband which is intrinsically related to the sexual abuse and exploitation of children. *New York* v. *Ferber, supra.* In *Ferber,* the United States Supreme Court stated that "[i]t is evident beyond the need for elaboration that a State's interest in 'safeguarding the physical and psychological well-being of a minor' " is " 'compelling' " and explained that "[t]he prevention of sexual exploitation and abuse of children constitutes a government objective of surpassing importance." *Id.* at 756-757.[32] Thus, the materials at issue here, child pornography, can be distinguished from the mere obscenity involved in *Stanley.* Since the protection of children through the eradication of child pornography is a compelling interest and since R.C. 2907.322(A)(5) is sufficiently narrowly drawn to limit its application to child pornography, the statute's intrusion into an individual's significant privacy interest is not unconstitutional. Accordingly, I join in the reversal of the judgment of the court of appeals.

CLIFFORD F. BROWN, J., concurring. See *infra* at 354.

---

[32] See, also, *FCC* v. *Pacifica Found.* (1978), 438 U.S. 726, in which the court stated that the protection of children from exposure to profane or indecent material in radio broadcasts, a media "uniquely accessible to children" (*id.* at 749), was a primary concern and upheld the authority of the FCC to regulate indecent, non-obscene, broadcasts over radio or television.