[No. 24811-1-I.   Division One.   February 25, 1991.]

THE STATE OF WASHINGTON, *Respondent,* v. ROGER D. SMITH, *Appellant.*

George R. Landrum, for appellant.

Norm Maleng, Prosecuting Attorney, and Dean Lum, Deputy, for respondent.

Michael Slote on behalf of the American Civil Liberties Union, amicus curiae.

Janet Ainsworth (George R. Nock, of counsel), amicus curiae.

RINGOLD, J.*—The defendant, Roger D. Smith, appeals from the judgment and sentence imposed after he was found guilty on August 3, 1989, at a stipulated bench trial,

---

*Judge Solie M. Ringold is serving as a judge pro tempore of the Court of Appeals pursuant to RCW 2.06.150.

of 23 counts of violating former RCW 9.68A.050(1),[1] dealing in depictions of a minor engaged in sexually explicit conduct, and three counts of possession of depictions of a minor engaged in sexually explicit conduct. Former RCW 9.68A.070.[2] He assigns error to the trial court's denial of a motion to suppress evidence seized pursuant to a search warrant. Smith's primary contention on appeal is that the affidavit supporting issuance of the search warrant was constitutionally defective. We agree and reverse.

The physical evidence supporting the convictions was seized pursuant to a federal search warrant issued on May 19, 1989. The charges of "dealing" in depictions were based on evidence that the defendant copied onto videotape for his own use commercially prepared 8 mm. films. There was no evidence that Smith distributed or traded pornography, that he had personally taken any pictures of minors engaged in sexually explicit conduct, or that he had ever had sexual contact with any minor.

The search warrant was issued by a federal magistrate, pursuant to an FBI investigation of violations of 18 U.S.C. §§ 2251 et seq., the Sexual Exploitation of Children Act.[3] The affidavit in support of the search warrant was prepared by Patrick Ross, an FBI agent with specialized training "in the area of sexual exploitation of minors." ¶ 2. The bulk of Agent Ross's 19–page affidavit is devoted to establishing the following "pedophile" profile:

---

[1]Former RCW 9.68A.050 provided in pertinent part:

"A person who:

"(1) Knowingly develops, duplicates, publishes, prints, disseminates exchanges, finances, attempts to finance, or sells any visual or printed matter that depicts a minor engaged in an act of sexually explicit conduct . . . is guilty of a class C felony".

[2]Former RCW 9.68A.070 provided in pertinent part:

"(1) A person who knowingly possesses visual or printed matter depicting a minor engaged in sexually explicit conduct is guilty of a gross misdemeanor."

[3]In particular, 18 U.S.C. § 2252(a)(2) prohibits the knowing receipt in interstate or foreign commerce of a visual depiction of a minor engaging in sexually explicit conduct.

11. This affiant states that pedophiles are defined as persons whose sexual objects are children. They receive sexual gratification and satisfaction from actual physical contact with children and from fantasies involving use of pictures and other photographic or art medium. The word pedophile means child (pedo) lover (phile). Pedophilia means the attraction to (philia) children (pedo).

Affiant states that as a result of the aforementioned training and experience, I have found the following characteristics to be true of pedophiles:

a. Pedophiles have a specific age preference for the juvenile victim and that when the victim surpasses this age, the pedophile, no longer having sexual interest in the victim, will seek out a younger juvenile to take the victim's place sexually.

b. Pedophiles will not stop or remain with one juvenile victim, but will constantly seek out new victims, using the same method of seduction that has been successful for him/her in the past.

c. Pedophiles will never stop their sexual activity after one juvenile victim, but will continue to molest juveniles whenever the opportunity arises.

d. Pedophiles will retain photographs, magazines, movies and correspondence relating to the sexual victimization of children. This retention will span many years and the material is used by the pedophiles to lower the child's inhibitions and to relive the pedophiles' sexual experiences with his/her juvenile victims. It has been my direct experience as well as the experience of other investigators who have worked in this field nationwide, that pedophiles have retained this type of material in excess of twenty years for the purposes aforementioned.

e. Pedophiles will frequently seek out employment or become involved in volunteer services to be close to children and to use the authority so vested by position and age to victimize children with whom he/she comes into contact. In short, pedophiles seek some manner of access to juvenile victims.

f. The majority of pedophiles prefer contact with children of one sex, as well as in a particular age or developmental range peculiar to each individual.

g. Pedophiles obtain, collect and maintain photographs of the children they are or have been involved with. These photos may depict children fully clothed, or in various stages of undress or totally nude, in various activities, not necessarily sexually explicit. These photos are rarely, if ever, disposed of and are revered with such devotion that they are often kept on the pedophile's person and/or in an area that is readily accessible to the pedophile.

h. Pedophiles often keep the names of children they are involved with or with whom they have had some kind of sexual

contact. These names may be maintained in phone or note-books, or merely on scraps of paper.

i. Pedophiles often correspond with or meet with one and another, share information and identities of their victims as a means of gaining status, trust, acceptance and psychological support.

j. Pedophiles often collect sexually explicit materials consisting of photographs, magazines, motion pictures, video tapes, books and slides which they use for their own sexual gratification.

k. Pedophiles collect books, magazines, newspapers and other writings of sexual activities with children. They maintain these as a way of understanding their feelings towards children, of justifying those feelings and finding continence for their illicit behavior and desires. Pedophiles who so obtain these materials, rarely destroy these materials because of the psychological support they provide.

l. Pedophiles frequently go to great lengths to conceal and protect from discovery, theft and damage, their collection of illicit material. This often includes the rental or use of safe deposit boxes and other storage facilities outside their immediate residence.

m. Pedophiles frequently use sexual aides such as dildos, vibrators, and sexually explicit clothing and other toys, in addition to toys of a type that aid in the seduction of their victims. They often utilize these as a means of exciting their victims and of arousing the curiosity of the children.

This pedophile profile relates information supplied to Agent Ross by three individuals: Special Agent Kenneth Lanning of the FBI's National Center for the Analysis of Violent Crimes; Detective William H. Dworin of the Los Angeles Police Department Exploited Child Unit; and Dr. Roland Summit, M.D., "head physician at Los Angeles County Harbor General Hospital," a community psychiatrist. The affidavit describes Agent Lanning as a "leading law enforcement expert in child exploitation investigations," who has written a monograph on child molesters and assisted local and federal investigative agencies in the "area of the sexually exploited child." ¶¶ 6, 8a.

Detective Dworin is described as having participated in more than 1,500 "investigations involving the sexual exploitation of minors" and having personally conducted more than 800 investigations "resulting in felony charges of

child molestation and exploitation." ¶ 9b. Detective Dworin's further qualifications include having "read numerous publications dealing with the exploitation of children," spoken to "in excess of 800 admitted child molesters" and examined "in excess of 15,000 letters between pedophiles describing their sexual activities with children and the manner in which they exploit children for sexual gratification." ¶¶ 11b, 11g.

Dr. Summit has assisted local and federal investigative agencies and prosecutors "in the area of the Sexually Exploited Child." ¶ 10b. According to Dr. Summit, the "lifelong pedophile is the most active consumer and small time producer of child pornography . . .". ¶ 10c. In addition, in Dr. Summit's opinion, "once a pedophile, always a pedophile . . . a pedophile cannot be cured" and a "non-pedophile would be disgusted or troubled by child pornography." ¶¶ 10g, 10h.

With regard to Smith, the affidavit recites the following information:

12. According to Special Agents Alan J. Rogers and Michael A. Randolph of the Los Angeles FBI office, in January 1987, an investigation was conducted of a business named FERSANCO, located in Porto Codex, Portugal. Agents mailed U.S. currency to this business in response to an advertisement from this business offering photographs of young nude males in sexually explicit poses. (The advertisement is attached to this affidavit as Exhibit A.) On February 13, 1987, the photographs were received by the FBI. These photographs revealed pre-pubescent males in sexually explicit poses. The United States Attorney's Office in Los Angeles has determined that these photographs violated 18 U.S.C. § 2252.

13. On January 16, 1989, Jose Marques Vidal, director of police in Lisbon, Portugal, provided the FBI with a list of individuals in the United States who have received hard-core child pornography materials from FERSANCO, according to· FERSANCO records that had been seized by Lisbon Police as a result of the FBI investigation. Included in this list is R.D. Smith, 16704 – 72nd Avenue N.E., Bothell, Washington 98011.

14. According to Special Agent Rogers, for the past five years, his duties with the Southern California Child Pornography Task Force include the receipt and review of numerous sexually-oriented publications available in the Los Angeles area. According to Special Agent Rogers, these publications

carry advertisements from companies throughout the world that manufacture and distribute sexually–oriented material. According to Special Agent Rogers, he first observed advertisements from FERSANCO in 1987.

15. According to officials from the U.S. Postal Service, in December 1973, a search was made of a warehouse belonging to Roy Clifton Ames in Houston, Texas. Postal Inspectors seized over four tons of child pornography materials. In 1975, a second search was conducted of Ames' warehouse by Houston police officers. In this search, over two tons of child pornography were seized.

16. In the letters seized during both searches, officials found correspondence from R.D. Smith, 16704 –72nd Avenue Northeast, Bothell, WA 98011. In numerous letters that were seized, Smith described his receipt of various items of hard–core child pornography, including depictions of young boys engaging in sexual intercourse with older boys, and scenes of children in sexual bondage. In one letter, Smith wrote that he had been buying this explicit material for about five years. In another letter, Smith commented that a particular child pornography film would have been better if the manufacturers had "tossed in a stiff 14–year old." In another letter, Smith wrote that he possessed 650 slides of hard–core sexual activity involving children and "who knows how many B & W sets, all of which are enjoyably reviewed from time–to–time." Officers also recovered order forms with Smith's name and address, personal checks from Smith, and a release form signed by Smith indicating that he is not offended by sexually oriented material.

The affidavit then recites Smith's address, that he is currently employed as a school bus driver, and that he has never been married.

The trial court upheld the warrant, finding that there was sufficient information to permit independent review by the magistrate and support the conclusion that the evidence sought was likely to be found at Smith's residence. Following conviction, the trial court imposed an exceptional sentence consisting of two 60–month consecutive terms.

### DID THE AFFIDAVIT ESTABLISH PROBABLE CAUSE?

■ Probable cause in an affidavit supporting a search warrant is established "by setting forth facts sufficient for a reasonable person to conclude the defendant probably is involved in criminal activity." *State v. Huft,* 106 Wn.2d 206, 209, 720 P.2d 838 (1986). Affidavits are to be read in a

commonsense rather than a hypertechnical fashion. *State v. Fisher,* 96 Wn.2d 962, 965, 639 P.2d 743, *cert. denied,* 457 U.S. 1137 (1982). The trial court is entitled to great deference in its probable cause determination. *State v. Cord,* 103 Wn.2d 361, 366, 693 P.2d 81 (1985).

Agent Ross's affidavit consists of two parts: (1) recitation of information relating specifically to Smith; and (2) establishment of the pedophile profile. As it pertains specifically to the defendant, the affidavit recites that letters written by Smith were seized along with large quantities of child pornography from a Texas warehouse in 1973 and 1975. In these letters, Smith apparently described in some detail his purchases of child pornography, including the fact that he had been buying such material for 5 years, his critique of a specific film, and an admission of possessing 650 slides of child pornography and "who knows how many B & W sets, all of which are enjoyably reviewed from time–to–time." ¶ 16. Nothing in the affidavit, however, indicates when the Texas letters were written. At the very latest, these letters were written between 1973 and 1975.

The inferences that may reasonably be drawn from Smith's admitted possession of child pornography prior to 1975 are limited by more than the staleness of the information. At the time of Smith's admitted possession, no state appears to have criminalized the private possession of child pornography. *See generally* Note, *Private Possession of Child Pornography: The Tensions Between* Stanley v. Georgia *and* New York v. Ferber, 29 Wm. & Mary L. Rev. 187 (1987). Arguably, under the authority of *Stanley v. Georgia,* 394 U.S. 557, 22 L. Ed. 2d 542, 89 S. Ct. 1243 (1969), the private possession of such materials in the mid–1970's was protected by the First Amendment.

The United States Supreme Court first addressed state sanctions against child pornography in *New York v. Ferber,* 458 U.S. 747, 73 L. Ed. 2d 1113, 102 S. Ct. 3348 (1982), where it upheld a New York statute criminalizing the distribution of material depicting a sexual performance by a child. The Court held that the constitution permitted more

extensive regulation of such materials when they involved children. *Ferber,* 458 U.S. at 753.

Based in part on the authority of *Ferber,* a number of states enacted statutes that, in addition to criminalizing the creation and distribution of child pornography, proscribed the private possession of such materials. *See* Note, *Private Possession, supra; State v. Meadows,* 28 Ohio St. 3d 43, 503 N.E.2d 697 (1986). The United States Supreme Court first upheld such statutes in *Osborne v. Ohio,* __ U.S. __, 109 L. Ed. 2d 98, 110 S. Ct. 1691 (1990). The conduct for which Smith was convicted was first proscribed by statute in this state in 1984. *See* Laws of 1984, ch. 262. The validity of former RCW 9.68A.070 on federal constitutional principles was upheld in *State v. Davis,* 53 Wn. App. 502, 768 P.2d 499 (1989).

As the foregoing summary indicates, evidence of possession of child pornography in the early 1970's, some 10 years before such conduct was expressly proscribed, must be viewed with extreme skepticism. As the United States Supreme Court observed in *Osborne v. Ohio, supra,* one of the compelling state interests in proscribing private possession is that "the State's ban on possession and viewing encourages the possessors of these materials to destroy them." *Osborne,* 110 S. Ct. at 1697. The reasonable inference to be drawn from such old evidence of possession, standing alone, is that the citizens of this state obeyed the law and destroyed the banned materials.

The only other allegations in the affidavit purporting to tie Smith and his residence to evidence of child pornography is the FERSANCO list. The FERSANCO list, allegedly encompassing individuals in the United States who have "received" child pornography, was apparently prepared by the Lisbon police from FERSANCO records that had been seized as a result of the FBI investigation. The affidavit sets forth no details, however, indicating the nature and age of the records seized, how they permitted compilation of a list of individuals who had "received" child pornography from FERSANCO, or the date of any alleged possession.

The State maintains that the FERSANCO information was relatively recent, relying on the recitation that Agent Rogers had been reviewing "numerous sexually–oriented publications" available in the Los Angeles area for 5 years[4] and had first observed FERSANCO advertisements in 1987, *i.e.,* at about the same time the FBI initiated its investigation. ¶ 14. Nothing in the affidavit, however, indicates that Agent Rogers' familiarity with "sexually–oriented publications" was sufficiently comprehensive to raise an inference that FERSANCO was a new enterprise or that the records seized by the Lisbon police pertained to activities occurring after 1987.

The "fellow officer" rule, cited by the State, is of no assistance to a magistrate reviewing the FERSANCO information. Under certain circumstances, the "fellow officer rule" permits a probable cause determination based upon information possessed by the police as a whole. *See generally State v. Maesse,* 29 Wn. App. 642, 629 P.2d 1349, *review denied,* 96 Wn.2d 1009 (1981); 2 W. LaFave, *Search and Seizure* § 3.5 (2d ed. 1987). In addition, information provided by one police officer to another is generally presumed to be reliable. 2 W. LaFave, *supra.* The State has not cited any decisions, however, applying the "fellow officer" rule to information provided by a foreign police agency. In any event, the fact that the information provided by the Portuguese police to the FBI may be deemed to be reliable does not substitute for the absence of specific facts establishing the date of Smith's alleged possession or receipt of child pornography.

In summary, the FERSANCO information no more permits a reasonable inference of the *current* presence of child pornography at Smith's residence than does the Texas information.

---

[4]Apparently Rogers' duties in this area started in 1984. There is no indication in the affidavit that the FBI had been investigating child pornography prior to 1984.

■ The facts and circumstances before the magistrate must support the reasonable probability that criminal activity was occurring "at or about the time the warrant was issued." *State v. Higby,* 26 Wn. App. 457, 460, 613 P.2d 1192 (1980). "Tabulation of the intervening number of days" is one of the factors to be considered, but is not controlling. *State v. Higby, supra* at 460. Other factors to be considered include the nature of the crime, the nature of the criminal, the character of the evidence to be seized, and the nature of the place to be searched. *See* 2 W. LaFave § 3.7(a), at 77; *State v. Higby, supra.* Here, given the type of evidence sought and the ongoing nature of the alleged offense, the exact date of recent criminal activity is less critical than if probable cause were based on a single, isolated transaction. *See* 2 W. LaFave, *supra; State v. Woodcock,* 407 N.W.2d 603 (Iowa 1987).

The fact that the passage of time may be of reduced importance under such circumstances, however, does not eliminate the requirement that the affidavit raise a reasonable inference that the evidence is currently to be found in the defendant's residence. The State does not seriously maintain that the allegations in the affidavit pertaining specifically to Smith, *i.e.,* admissions that he possessed and "enjoyably reviewed" child pornography prior to 1975 or 1973 and that his name appeared on the undated FER-SANCO list, are sufficient in themselves to establish probable cause. Rather, the State relies on the pedophile profile to supply this critical inference.

## THE FAULTY SYLLOGISM

■ The State's argument may be summarized as follows: pedophiles collect child pornography; pedophiles utilize child pornography both to relive past involvement with child victims and to victimize additional children; because child pornography serves both a psychological and practical purpose for pedophiles, and pedophiles can never be cured, pedophiles are likely to retain child pornography for indefinite periods of time, up to 20 years; Smith possessed child

pornography sometime prior to 1975 and possibly at some later date; therefore, a magistrate could reasonably determine that child pornography is likely to be found in Smith's residence in 1989. The flaw in this reasoning, however, is that its validity depends on the assumption that Smith fits the pedophile profile. We find no justifiable basis in the affidavit to support such an assumption.

A pedophile as defined in Agent Ross's profile is essentially an incurable child molester. Paragraphs a, b, c, d, e, f, g, h, i, and m of Agent Ross's profile deal expressly with the characteristics of the relationship between pedophiles and their child victims. The training and experience of Agent Ross and of the experts he relies upon are based upon contact with admitted and convicted child molesters. All the opinions expressed by Ross and the other experts are based upon data created from a limited population of known child molesters. Nothing in the affidavit, however, would permit a magistrate to conclude that Smith possesses the characteristics of a pedophile as that concept is developed in the affidavit.

The State has cited several cases upholding search warrants based in part on "pedophile" profiles. These decisions are distinguishable because the profile was supplemented by recent evidence of criminal conduct. *See State v. Young,* 37 Ohio St. 3d 249, 525 N.E.2d 1363 (1988) (informant observed child pornography in defendant's bedroom three months prior to issuance of search warrant), *aff'd in part and rev'd in part on other grounds sub nom. Osborne v. Ohio, supra; State v. Woodcock, supra* (juvenile informant had sex with defendant 1½ years prior to issuance of search warrant).

In summary, because the affidavit here failed to allege sufficient specific characteristics to bring Smith within the profile, any inference of current possession based on the profile was unreasonable. Viewed in a commonsense fashion, Agent Ross's affidavit provided nothing beyond stale evidence of possession.

■ Smith next contends that the private possession of child pornography is protected by the Washington Constitution and that his convictions pursuant to former RCW 9.68A.050(1) and 9.68A.070 are therefore invalid. Smith does not, however, discuss the criteria for such an analysis that are set forth in *State v. Gunwall,* 106 Wn.2d 54, 61–62, 720 P.2d 808, 76 A.L.R.4th 517 (1986). Analysis based on the *Gunwall* criteria is a "necessary step" before this court can determine whether the state constitution provides greater protection than the federal constitution. *Spokane v. Douglass,* 115 Wn.2d 171, 176, 795 P.2d 693 (1990). Absent such briefing and analysis, we decline to address Smith's state constitutional arguments. *See State v. Carver,* 113 Wn.2d 591, 599, 781 P.2d 1308, 789 P.2d 306 (1989).

Finally, in view of our determination that the evidence here must be suppressed, we need not consider the assignment of error challenging the imposition of an exceptional sentence.

We reverse the judgment and sentence imposed and remand to the trial court for proceedings consistent herewith.

GROSSE, C.J., and SCHOLFIELD, J., concur.

Review denied at 116 Wn.2d 1031 (1991).