WISE, Presiding Judge.
 

 The appellant, Corey Beantee Melton, was convicted of possession of obscene matter, a violation of § 13A-12-192(b), Ala.Code 1975. The trial court sentenced him to serve a term of ten years in prison. Melton did not file a motion for a new trial. This appeal followed.
 

 The State presented evidence that, on September 8, 2005, Melton took his computer to the Best Buy electronics store on Highway 280; that Melton talked to Josh Woods, a senior counter-intelligence agent for the Geek Squad;
 
 [1]
 
 that Melton told Woods that he had been having trouble connecting to the Internet, that he had a broadband Internet connection, that he had just installed a new network interface card, and that he was still having difficulty connecting to the Internet; that Melton filled out the top portion of an “In-Store Tactical Analysis Form” that included his name, address, telephone number, and email address; that, when inspecting the computer, Woods found that the computer had a fairly “ramped” virus and spyware infection and brought that to Melton’s attention; that Melton agreed to the removal services the Geek Squad offered; that the Geek Squad took possession of the computer and put it in its repair center; and that the repair center was in the back of the store in a non-customer facing area. (R. 118.)
 

 Woods testified that he was the first repair agent who worked on Melton’s computer; that he started working on the computer on September 10, 2005; that he started all hardware diagnostics on the computer, including the hardware scan on the hard drive, motherboard, and individual hardware components; that he also started and finished several virus and spy-ware scans and completed part of the “post-op” on the computer; that Kyle Phillips, a part-time agent who was also part of the repair squad, worked on additional scans after his initial scan; that, during the repair, they ran across several files that would not remain clean; that they would remove the virus, but the virus would reinstall itself when the computer was rebooted; that that caused their attention to be directed toward those files; and that, at that time, they found several file tags or filenames of a very explicit nature that indicated that the files might contain child pornography. He also testified that they did not open files while they were there; that members of the Geek Squad are instructed not to open any kind
 
 *918
 
 of personal information on any computers while they are there and are supposed to immediately contact law enforcement officers if they notice anything that could be illegal; and that company policy provided that, any time they ran into anything that might be of an illegal or explicit nature, they were to immediately contact the police department, turn over all evidence and available information to law enforcement authorities, and work hand-in-hand with law enforcement authorities.
 

 Woods testified that Phillips contacted Sergeant Ronald Sellers; that, after Phillips told him he had contacted Sellers, he decided to contact Detective Scott Salser because he had Salser’s cellular telephone number; that law enforcement officers came to the store; that he talked to Sellers and Salser at the store; that Salser asked him if he could show them some of the information involved; that he removed the hard drive from the computer, plugged it into their diagnostic station, and showed him the evidence; that the information was a very explicit video of a pornographic nature; that the video contained an adult male, an adult female, and an apparently underage female engaged in sexual activity; that Salser and Sellers were there and saw this; that, at that point, Salser and Sellers asked if they could take possession of the computer; and that Salser subsequently took possession of the computer.
 

 During a hearing on a motion to suppress evidence, Sergeant Ronald Sellers of the Birmingham Police Department testified that, in September 2005, he was contacted by Phillips, an employee at the Best Buy store on Highway 280; that Phillips told him that they were doing some repair work on a computer and saw some images on the computer that they were concerned about; that he and other officers went to the Best Buy store, which was in Shelby County, but Phillips was not there; that he talked to a Mr. Turner, who told him that Phillips had told him about what was going on and that the officers were to see him; that he came into contact with Melton’s computer; that Turner showed them some files that he had seen that he believed contained images of child pornography; that Turner initially showed him a file name from Melton’s computer on a computer screen; that he believed that Turner opened the file and that he viewed the contents of the file; that, in that file, he saw a video that showed what he believed to be a minor child and an adult male engaged in sexual acts; that he and the other officers opened at least two subfiles; that, if the files had contained adult pornography, they would have closed the files and left the store; that, after seeing the video, they started gathering information about who owned the computer, who turned the computer in, and who started the process of repairing the computer; that he believed that the hard drive was out of the computer; that the Best Buy employees put the computer back together for them; that they took the computer and turned it in to their property room; and that they took possession of the computer at that point so that nothing could be changed or altered and nothing could be added to or deleted from it. He also testified that they started trying to find information on Melton; that they put together an application for a search warrant for the computer; that they subsequently obtained a search warrant in Shelby County; that he turned the search warrant over to Salser; and that Salser had the forensic examination performed on the computer.
 

 At trial, Sellers testified that, in 2005, he was a detective in the Vice/Narcotics Unit and was also working child exploitation cases; that, on September 8, 2005, Phillips, who was an employee at the Best Buy store on Highway 280, telephoned him and told him that they had a computer there, that they had seen some images on the
 
 *919
 
 computer that he was concerned about, and that they wanted him to look at the images; that he assumed the employees at the Best Buy store had seen the images before he got there and that was why Phillips had called him; that he, Salser, and Detective Terri Jones went to the Best Buy store; that the Best Buy store was in Shelby County; that Phillips was not there, and he met with Mr. Turner; that the Best Buy employees pointed them to the computer on which they had seen the images and wanted them to look at the computer; that the employees showed them the images on the computer; that the computer was already up and running; that the employees went to the file in which they had seen the images, and that was the file they looked at; that the file was a video showing a minor child and an adult male engaged in sexual activity; that he believed that Woods was the person who showed him the video; that he and the other detectives obtained information on the person who brought the computer to the Best Buy store; that the paperwork indicated that Melton was the person who had brought the computer in; that Best Buy employees put the computer back together; and that he and the other detectives took the computer into their possession, left the Best Buy store, took the computer to the Birmingham Police Department property room, and checked it in. He also testified that, on September 14, 2005, he obtained a search warrant for the computer and that he turned the warrant over to Salser.
 

 Sellers testified that there was an address for Melton on the documents he had obtained from Best Buy; that, around 9:30 a.m. on October 2, 2005, he and Detective Heath Boackle went to Melton’s home and interviewed him; that he went to the address, found the apartment, and knocked on the door; that, based on the address, he believed that the address was in Shelby County; that Melton came to the door; that he identified himself and Boackle and told Melton he had some questions about a computer he had taken to Best Buy and asked him if it would be okay to talk to him; that, during the interview, he told Melton that a Best Buy employee had contacted him and told him that they had seen some images on his computer that they were concerned about and wanted him to look at; that he told Melton there were some images on his computer of very young children and asked him about where he had obtained the images; that Melton told him he had been using a peer-to-peer sharing group and that he had gotten the images on his computer from the Internet; that he asked Melton if he was familiar with peer-to-peer sharing groups- and how they worked, and Melton said he was; that he asked Melton if he remembered downloading any images or videos on his computer; that Melton said he did and described one of the videos to him; that Melton told him he remembered that one video had a young female “going down on a man” and that he thought the girl and the man were lying on a bed; that he believed that was the same video he had seen at the Best Buy store; that he asked Melton if he knew that pictures of children on the computer were illegal, and Melton said that he did and that he had deleted some of the pictures; that he had asked Melton if he had used any search terms on his computer; that he asked Melton if he had ever used the term “lolita” before, and Melton said that he had; that he asked Melton for consent to search his computer; and that Melton gave him consent to search his computer. (R. 149,151.)
 

 Detective Scott Salser of the Birmingham Police Department testified that, in 2005, he was a member of the Narcotics Unit, worked with the Innocent Images Task Force with the Federal Bureau of Investigation (“FBI”), and worked child pornography cases; that, in September
 
 *920
 
 2005, he went to the Best Buy store; that members of the Geek Squad contacted the police department and notified him that, while they were doing repairs on a computer, they had discovered what they believed to be child pornography; that he and Sellers went to the Best Buy store together; that they went in and talked to a Geek Squad agent; that the members of the Geek Squad explained what they had been doing and what they had discovered; that they asked the Geek Squad to show them the file they thought was child pornography; that the members of the Geek Squad opened the file for them; that the file showed a prepubescent female on the bed, an adult male coming into view on the video, and the young female performing oral sex on the male; that they stopped the video, wrote down the name of the file containing the video, and included that file in their application for a search warrant; that they took the computer tower with them and turned it in to the property room; that he and Sellers subsequently obtained a search warrant; and that, after they obtained the search warrant, he took the computer to Special Agent John Bailey of the United States Secret Service. He also testified that the Best Buy employees said they had discovered what they believed to be child pornography and then showed them only what they had seen and that he and the other detectives had only looked at what the employees at the Best Buy store had already looked at.
 

 John Bailey testified that, in 2005, he was a special agent with the United States Secret Service; that he was assigned to perform criminal investigations and to be a computer forensics examiner; that he received Melton’s computer from Salser on November 29, 2005; that he analyzed the computer pursuant to the Birmingham Police Department’s request; that he found files that indicated that the computer either belonged to or was used by Melton because it contained his resume and numerous user-created photos of him; that he found videos that contained child pornography; that some of the videos were relatively short; that other videos were between fifteen and twenty minutes long; that, in his experience, the video files could not have been caused by “pop ups”; and that some of the videos were rather large video files.
 

 Melton testified that he bought the computer in question on eBay between late January 2005 and early February 2005; that the computer was a homemade desktop tower; that, when he bought the computer, he did not believe that it had any files, videos, or information on it, but he was not sure; that he bought the computer for a business he and his friends were starting; that he lived by himself, and his girlfriend had her own place; that he kept the computer in his apartment; that his two business partners, his best friend, and his girlfriend used the computer and also used the peer-to-peer network sharing software; that other people would also come to his apartment; that he traveled a lot and was not always at home; and that he put his girlfriend’s address on the paperwork at the Best Buy store in case he was not in town when they tried to call him. He also testified that he had not ever seen the videos the State introduced into evidence; that he had not ever seen those videos on his desktop; that he did not ever intentionally or unintentionally download child pornography; that, on one occasion, he saw child pornography and clicked on a file; that he deleted the file immediately; that he deleted the file within five to ten seconds of seeing a child performing a sexual act; that he did not know how the video had gotten on his computer; and that he did not ever see his girlfriend, business partners, or friends looking up child pornography.
 

 
 *921
 
 Melton testified that, in October 2005, Sellers and another officer came to his girlfriend’s apartment; that he did not live there at that time; that Sellers told him he had received a call stating that someone had seen some disturbing images and that he was there to follow up on the information; that he did not ever tell Sellers he had downloaded or pulled up child pornography and had erased some of it; and that he did not ever give Sellers permission to take possession of his computer, but he did give him consent to look at the computer. Finally, he testified that, when Sellers talked to him, Sellers had asked him how the files could have gotten on his computer; that he told Sellers that, if anything, he downloaded them using peer-to-peer network sharing software; and that he told Sellers that he had downloaded music and videos, but he did not remember downloading any child pornography.
 

 I.
 

 Melton argues that the State did not prove venue for the offense. Specifically, he contends that he lived in Jefferson County; that he kept the computer in Jefferson County; and that,
 

 “[w]ith the exception of testimony concerning the one instance where [he] took the computer to Best Buy in Shelby County, Alabama, the record is devoid of any testimony suggesting that the images in question were ever acquired or possessed anywhere other than Jefferson County. In essence, the criminal act with which [he] is charged was completed in Jefferson County, and the act of taking the computer to Best Buy in Shelby County was in no way necessary in order for the crime to be consumat-ed.”
 

 (Melton’s brief at pp. 21-22.) We addressed a similar claim in
 
 Gilliam v. State,
 
 502 So.2d 1210, 1210-11 (Ala.Crim.App. 1984), as follows:
 

 “Corporal Andrews of the Opelika Police Department was functioning as an undercover narcotics agent on December 15, 1982. He met with appellant, Bruce Irvin Gilliam, who proposed to set up a purchase of marijuana by Officer Andrews from a third party. The price was to be $1,350 and appellant was to receive $100 for brokering the transaction. They proceeded to the Wire Road exit of Interstate 85. Andrews handed the appellant $1,350, which he handed over to two people for a brown paper bag containing marijuana. Andrews and the appellant returned to Opelika in separate vehicles and stopped at Andrews’s trailer. Appellant Gilliam then got the bag of marijuana out of the officer’s truck and carried it into the trailer, where he weighed it. Officer Andrews then paid appellant the $100.
 

 “The Lee County grand jury indicted appellant under Code of Alabama 1975, Section 20-2-80(l)(a), for trafficking in cannabis....
 

 [[Image here]]
 

 “The indictment read in pertinent part:
 

 “ ‘... Bruce Irvin Gilliam, alias, whose true Christian name is otherwise unknown to the Grand Jury, did on, to-wit: December 15, 1982, knowingly and unlawfully possess Cannabis in an amount in excess of 2.2 pounds, but less than 2,000 pounds, in violation of § 20 — 2—80(l)(a) of the Code of Alabama.’
 

 [[Image here]]
 

 “Appellant contends that the court should have granted his motion for change of venue since the marijuana was obtained in Macon County, not Lee County. Both the state and appellant agreed that the possession of appellant was limited to appellant’s approaching the Officer’s truck, picking up the bag
 
 *922
 
 containing the marijuana, carrying it into the officer’s trailer, and weighing it on a set of triple beam scales. Is this sufficient possession? We find that it is. In
 
 Robinson v. State,
 
 428 So.2d 148 (Ala. Cr.App.1982), this court approved the following portion of the trial court’s oral charge:
 

 “‘The possession prohibited includes any possession by physical dominion of however brief duration.’
 

 “This proof of actual possession in Lee County was sufficient to support the jury’s verdict. Under a theory of constructive possession, these facts would support a finding that the appellant had actual or potential control over the substance and intent to exercise dominion over it, and an external manifestation of such intent and control. It is unquestioned that appellant had knowledge of the presence of the marijuana. We find the court did not err in denying the motion for change in venue.”
 

 Similarly, in this case, the evidence showed that Melton possessed the computer containing the images of pornography while at the Best Buy store in Shelby County. That evidence of the actual possession of the computer at the Best Buy store in Shelby County was sufficient to show that venue was proper in Shelby County. Therefore, Melton’s argument is without merit.
 

 II.
 

 Melton also argues that the trial court erred in denying his motion to suppress evidence law enforcement officers found pursuant to an allegedly unlawful search and seizure of his computer and his statement to law enforcement officers. Relying upon
 
 Walter v. United States,
 
 447 U.S. 649, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980), he contends that testimony indicated that members of the Geek Squad did not open any specific files before law enforcement officers arrived; that law enforcement officers exceeded the scope of the search conducted by members of the Geek Squad when they viewed the contents of specific files; and that, therefore, law enforcement officers should have obtained a warrant before opening those files.
 
 [2]
 

 “A ‘search’ occurs when an expectation of privacy that society is prepared to consider reasonable is infringed.”
 

 United States v. Jacobsen,
 
 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1983).
 

 In
 
 Walter,
 
 twelve large sealed packages that contained 871 boxes of 8-millimeter film depicting homosexual activities were shipped by a private carrier from St. Pe-tersburg, Florida, to Atlanta, Georgia. Although the packages were addressed to Leggs, Inc., they were mistakenly delivered to L’Eggs Products, Inc. Employees of L’Eggs Products, Inc., opened the twelve packages and saw the individual boxes of film. While examining the boxes of film, the employees saw suggestive drawings on one side of the boxes and explicit descriptions of the contents on the other side of the boxes. One of the employees opened one or two boxes and unsuccessfully tried to view portions of the film by holding the film up to the light. The employees contacted the FBI, and an FBI agent picked up the packages. More than
 
 *923
 
 two months after taking possession of the packages, FBI agents viewed the films with a projector. However, the FBI agents did not obtain a warrant or communicate with either the consignor or consignee of the packages before viewing the films. The United States Supreme Court held that the viewing of the films by the FBI agents “constituted an unreasonable invasion of their owner’s constitutionally protected interest in privacy.” 447 U.S. at 654, 100 S.Ct. 2395 at 2400. The government argued that the owners of the packages no longer had
 
 a
 
 reasonable expectation of privacy because a private party had opened the packages and had exposed the descriptive labels on the boxes. However, the Court rejected that argument, stating:
 

 “But petitioners expected no one except the intended recipient either to open the 12 packages or to project the films. The 12 cartons were securely wrapped and sealed with no labels or markings to indicate the character of their contents. There is no reason why the consignor of such a shipment would have any lesser expectation of privacy than the consign- or of an ordinary locked suitcase. The fact that the cartons were unexpectedly opened by a third party before the shipment was delivered to its intended consignee does not alter the consignor’s legitimate expectation of privacy. The private search merely frustrated that expectation in part. It did not simply strip the remaining unfrustrated portion of that expectation of all Fourth Amendment protection.”
 

 447 U.S. at 658-59, 100 S.Ct. at 2402-03 (footnotes omitted).
 

 However, unlike
 
 Walter,
 
 this case does not involve a situation in which the property was mistakenly delivered to a third party who then opened the packages. Rather, Melton voluntarily turned over the computer to members of the Geek Squad and agreed to the Geek Squad removing viruses and spyware that was on the computer. Therefore, we must determine whether Melton had a reasonable expectation of privacy in the files on his computer after he turned the computer over to members of the Geek Squad.
 

 The Superior Court of Pennsylvania addressed a similar situation in
 
 Commonwealth v. Sodomsky,
 
 939 A.2d 363 (Pa.Super.Ct.2007), as follows:
 

 “On appeal, the Commonwealth maintains that the trial court erred in concluding that Appellee retained a privacy interest in the computer because he voli-tionally relinquished any expectation of privacy in that item by delivering it to Circuit City employees knowing that those employees were going to install and test a DVD drive. We agree in part with this contention.
 

 “... We begin our discussion with
 
 Commonwealth v. Shoatz,
 
 469 Pa. 545, 366 A.2d 1216 (1976), which extensively analyzes whether individuals have the right to contest the search of their personal property after they have abandoned a privacy interest in that item. In
 
 Shoatz,
 
 police were investigating a report that three men were acting suspiciously and appeared to be preparing to burglarize a store. Police initiated surveillance of the threatened premises and shortly thereafter observed three men, two of whom were carrying suitcases, appear in an alley adjacent to the store. One of the officers approached the men and asked to speak to them. The two men who were carrying suitcases dropped them, and all of the men fled. Police searched the suitcases and discovered illegal weapons. The defendants, who were immediately apprehended, raised constitutional objections to the search of their suitcases. Our Supreme Court concluded that when the defendants dropped their suitcases and ran,
 
 *924
 
 they abandoned that property and thus, were not entitled to contest the search.
 

 “... The Court noted that Pennsylvania has adopted the theory of abandonment, which applies as long as improper police conduct did not induce a defendant’s desertion of his personal property. Pursuant to this legal construct, when an individual evidences an intent to relinquish control over personal property, he or she has abandoned a privacy interest in property and cannot object to any ensuing search of the item by police. Abandonment revolves around the issue of intent, which is determined from words, acts, and all relevant circumstances existing at the time the property is purportedly deserted. Accord
 
 Commonwealth v. Sanders,
 
 407 Pa.Super. 270, 595 A.2d 635, 638 (1991) (“whether a person reasonably may expect that his or her possessions shall be free from unwarranted governmental intrusion depends on the facts and circumstances’).
 

 “As the
 
 Shoatz
 
 Court explained, ‘The issue is not abandonment in the strict property-right sense, but whether the person prejudiced by the search had voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question so that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search.’
 
 Shoatz,
 
 supra at 553, 366 A.2d at 1220.
 

 “The theory of abandonment is extrapolated from the United States Supreme Court’s observation that ‘the Fourth Amendment protects people, not places. What a pérson knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.’
 
 Katz v. United States,
 
 389 U.S. 347, 351-52, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (citations omitted); see also
 
 Oliver v. United States,
 
 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984) (defendant did not have reasonable expectation of privacy in his visible real estate containing marijuana).
 

 “Our Supreme Court has more recently examined the principle in
 
 Commonwealth v. Hawkins,
 
 553 Pa. 76, 718 A.2d 265 (1998). In that case, the defendant handed an item to another individual, who then placed it in his mouth. Police seized the individual and extracted the property, which consisted of illicit drugs. Our Supreme Court refused to allow the defendant to object to the seizure of the drugs, noting that under current Fourth Amendment jurisprudence, a defendant cannot object to a search unless he establishes a legitimate expectation of privacy ‘in the area searched or effects seized’ and that such interest also must be sanctioned by society as reasonable and justifiable.
 
 Id.
 
 at 81, 718 A.2d at 267. It continued that a ‘legitimate expectation of privacy is absent where an owner or possessor meaningfully abdicates his control, ownership, or posses-sory interest’ in his personal property.
 
 Id.
 
 at 81-82, 718 A.2d at 267. The Court concluded that the defendant had abandoned his expectation of privacy in the drugs by handing them to the drug purchaser and that he had no legitimate expectation of privacy in that individual’s mouth. It also refused to grant the defendant derivative standing to object to the search of the drug purchaser’s body under the Pennsylvania Constitution.
 

 “... In the present case, we limit our inquiry to a determination of whether Appellee’s expectation of privacy in the videos on the computer that he relinquished to Circuit City employees for repairs was reasonable or whether he knowingly exposed the computer’s video files to the public such that he voluntan
 
 *925
 
 ly abandoned his privacy interest in them. The trial court found that Appel-lee did retain a privacy interest in the contents of the computer, reasoning that he did not expect the computer’s contents ‘to be published to anyone other than employees of Circuit City as needed to complete the requested installation.’ Trial Court Opinion, 3/6/06, at 7. In reaching this conclusion, the trial court noted that Appellee did not give Circuit City employees the right to delete files, access financial information, or access his e-mail and so thereby did not lose ‘all subjective’ expectation of privacy in his computer.
 
 Id.
 
 at 8. Thus, the trial court found the subsequent seizure of the computer to be illegal.
 

 ■ “The trial court analogized this case to
 
 Commonwealth v. Davis,
 
 743 A.2d 946 (Pa.Super.1999), wherein we held that a tenant did not relinquish his privacy interest in an apartment merely because the landlord had limited access rights to the apartment and that the landlord could not, therefore, consent to a war-rantless search of the apartment. Similarly, in
 
 Commonwealth v. DeJohn,
 
 486 Pa. 32, 403 A.2d 1283 (1979), the Supreme Court found that under the Pennsylvania Constitution, a person retains a privacy interest in bank records, and further held that a bank cannot submit the records to the police in the absence of a search warrant. The
 
 DeJohn
 
 decision was based primarily on the fact that an individual’s disclosure of financial records to a bank was not entirely voluntary in that one cannot participate in modern society without obtaining a bank account. The
 
 DeJohn
 
 Court also observed that a customer discloses his financial records to a bank for a limited purpose, to aid in conduct of financial affairs, and that a customer’s expectation of privacy is not diminished merely because a bank maintains the records.
 

 “Initially, we must observe that the trial court did not employ the proper legal standard. First, the court focused on the irrelevant question of whether Appellee gave Circuit City employees access to financial records and e-mail files. These items were not searched; what Appellee did not give employees permission to do is not the consideration. We must examine whether he did give access or knowingly risk access to his video files, which were the items discovered herein. Furthermore, contrary to the trial court’s conclusion, if Appellee exposed the video contents of his computer to Circuit City employees, he abandoned his privacy interest in those computer contents because those employees were members of the public. If Appellee knowingly published his computer video files to members of the public, he had no reasonable expectation, under the applicable law, that the video files would not be disseminated to other individuals, including police.
 

 “As noted, abandonment is a question of intent and dependent upon all the attendant facts and circumstances. In accordance with this pertinent standard, we therefore will scrutinize all the facts and circumstances to determine whether Appellee retained a reasonable expectation of privacy in his videos. First, we observe that Appellee gave the employees permission to perform certain actions relative to his computer files. He requested and consented to the installation of a DVD drive and was specifically informed that the drive’s operability would be tested by Circuit City employees. Appellee failed to either inquire as to how the DVD drive would be tested or otherwise restrict the employees’ access to his computer files for that purpose. Thus, Appellee should have been aware that he faced a risk of exposing the contents of his illegal video files.
 
 *926
 
 Cf.
 
 United States v. Barth,
 
 26 F.Supp.2d 929 (W.D.Tex.1998) (computer owner did not lose reasonable expectation of privacy in computer files contained in searched hard drive because owner gave repairman, a confidential informant, hard drive for limited purpose of repairing problem unrelated to files that were searched).
 

 “We also find it critical to our analysis that when the child pornography was discovered, the Circuit City employees were testing the DVD drive’s operability in a commercially-accepted manner rather than conducting a search for illicit items. Cf.
 
 Barth, id.
 
 Appellee implies that the DVD drive should have been tested by inserting and playing a DVD. Appellee’s brief at 8. Nevertheless, as noted, Appellee did not ask how the burner would be tested nor did he place any restrictions regarding the manner of that procedure. As Mr. Richert’s testimony indicated, the playing of videos already in the computer was a manner of ensuring that the burner was functioning properly. Once the search for videos was initiated, the list of Appel-lee’s videos appeared automatically on the computer screen. The employee testing the burner was free to select any video for testing purposes, as Appellee had not restricted access to any files. Therefore, Mr. Richert did not engage in a fishing expedition in this case.
 

 “The final factor we utilize is the volitional nature of Appellee’s actions. In this case, Appellee removed the computer from his home, took the computer to Circuit City, and left it there without either removing the videos containing child pornography or changing the titles of the videos so that they did not appear to have illegal content. Contrary to the circumstances in
 
 DeJohn,
 
 supra, where a person has little choice but to retain bank accounts in order to function in society, Appellee was not compelled to take this particular computer containing child pornography to the store in the first instance, nor was he forced to leave it there after being informed that the burner’s operability would be checked. Appellee was aware of the child pornography and could have elected to leave the store with the computer rather than risk discovery of the porno graphic files.
 

 “This scenario also stands in contrast with the landlord case relied upon by the trial court. Although landlords routinely retain the right to inspect their premises upon notice, people still retain a privacy expectation in their home despite its status as rental property. Here, however, we find that under the facts and circumstances presented, Ap-pellee knowingly exposed to the public, the Circuit City employees, the contents of his video files. It is clear that Circuit City employees were members of the public; hence, if Appellee knowingly exposed the contents of his video files to them, as members of the public, he no longer retained an expectation of privacy in those videos nor could he expect that they would not be distributed to other people, including police.
 

 “... As noted, the trial court overlooked the attendant facts and circumstances in this case and improperly focused upon what access rights Appellee had not granted to the Circuit City employees. While the trial court may or may not be correct that Appellee retained a privacy interest in other computer files, such as e-mail or financial records, he did not retain a privacy interest in his videos under the facts and circumstances herein.
 

 “... Since Appellee abandoned his privacy interest in the videos contained in the computer, he cannot object to the subsequent viewing of the video list and file by police. As noted, our decision is firmly rooted in current Pennsylvania
 
 *927
 
 authority; we therefore reject Appel-lee’s independent reliance on the Pennsylvania Constitution to protest the police actions in this case.
 

 “... Our result in this case is consistent with the weight of authority in this area. If a person is aware of, or freely grants to a third party, potential access to his computer contents, he has knowingly exposed the contents of his computer to the public and has lost any reasonable expectation of privacy in those contents. E.g.
 
 United States v. Simons,
 
 206 F.3d 392 (4th Cir.2000) (where employee was informed that his work-related internet activity would be scrutinized by employer, he had no legitimate expectation of privacy in fruits of his internet activity as he knowingly exposed such activity to public);
 
 United States v. King,
 
 [ (No. 2:05CR301-WHA, Nov. 28, 2006) ] (M.D.Ala.2006) [not reported in F.Supp.2d] (defendant knowingly exposed personal files to public under
 
 Katz
 
 by linking to network after being informed that personal files could and would be searched using network even though defendant attempted to protect files from network search);
 
 Lown v. State,
 
 172 S.W.3d 753 (Tex.App. 2005) (defendant did not have reasonable expectation of privacy in files on work computer which were backed up at request of people in authority at defendant’s company).”
 

 (Footnotes omitted.)
 

 Similarly, in this case, Melton voluntarily took his computer to the Best Buy store and turned it over to members of the Geek Squad. Also, the State presented evidence that indicated that Melton knew about the existence of the child pornography on the computer. Further, Woods testified that he found viruses and software on the computer and that Melton agreed to members of the Geek Squad removing the viruses and spyware. The record does not indicate that Melton placed any limitations on the Geek Squad’s access to the computer, inquired as to how the viruses and spy-ware would be removed, or inquired as to whether any individual files would be accessed. Additionally, Melton had not deleted those specific files before he turned the computer over to members of the Geek Squad. Finally, Melton did not make any attempt to put a password lock on any of the individual files containing child pornography.
 
 See Signorelli v. State,
 
 (No. 09-06-450 CR, Jan. 16, 2008) (Tex. Ct.App.— Beaumont 2007) (not reported in S.W.3d) (holding that, “[b]y failing to restrict the repairman’s access to the files or folders at issue and by failing to password-protect them, Signorelli assumed the risk that the repairman would access them in the general course of repairs”). Based on the specific facts of this case, Melton relinquished any reasonable expectation of privacy in the files containing child pornography when he exposed the members of the Geek Squad to those files. Because he did not retain a privacy interest in those files, the officers did not violate Fourth Amendment principles when they viewed the contents of any of those files, regardless of whether the officers exceeded the scope of the search conducted by members of the Geek Squad.
 

 Even if we were to find that Melton did not relinquish all expectations of privacy by merely turning the computer over to members of the Geek Squad, we next determine whether any expectation of privacy he retained in the files was an expectation that society is prepared to consider reasonable. In this case, law enforcement officers had been contacted by Best Buy employees regarding child pornography on Melton’s computer. When the officers first arrived at the store, employees of Best Buy showed them the file names of the questionable files. Those file names were extremely explicit and were highly suggestive of child pornography. Also,
 
 *928
 
 Sellers testified about some terms that are commonly used when searching for child pornography, and we note that some of those terms were contained in some of the file names on Melton’s computer. It is undisputed that the officers were properly in the presence of the computer at that time and that the officers were properly looking at the file names found by Best Buy employees. Therefore, the question in this case is not whether society would generally find an expectation of privacy in computer files to be reasonable. Rather, the question is whether, at the time law enforcement officers were at the Best Buy store, an expectation of privacy in files with explicit names that suggested that they contained child pornography was an expectation that society is prepared to consider reasonable.
 

 In
 
 United States v. Jacobsen,
 
 466 U.S. 109, 122-23, 113 104 S.Ct. 1652, 1661-62, 80 L.Ed.2d 85 (1984), the United States Supreme Court addressed a similar issue as follows:
 

 “The question remains whether the additional intrusion occasioned by the field test, which had not been conducted by the Federal Express agents and therefore exceeded the scope of the private search, was an unlawful ‘search’ or ‘seizure’ within the meaning of the Fourth Amendment.
 

 “The field test at issue could disclose only one fact- previously unknown to the agent — whether or not a suspicious white powder was cocaine. It could tell him nothing more, not even whether the substance was sugar or talcum powder. We must first determine whether this can be considered a ‘search’ subject to the Fourth Amendment — did it infringe an expectation of privacy that society is prepared to consider reasonable?
 

 “The concept of an interest in privacy that society is prepared to recognize as reasonable is, by its very nature, critically different from the mere expectation, however well justified, that certain facts will not come to the attention of the authorities. Indeed, this distinction underlies the rule that Government may utilize information voluntarily disclosed to a governmental informant, despite the criminal’s reasonable expectation that his associates would not disclose confidential information to the authorities. See
 
 United States v. White,
 
 401 U.S. 745, 751-752, 91 S.Ct. 1122, 1125-1126, 28 L.Ed.2d 453 (1971) (plurality opinion).
 

 “A chemical test that merely discloses whether or not a particular substance is cocaine does not compromise any legitimate interest in privacy. This conclusion is not dependent on the result of any particular test. It is probably safe to assume that virtually all of the tests conducted under circumstances comparable to those disclosed by this record would result in a positive finding; in such cases, no legitimate interest has been compromised. But even if the results are negative — merely disclosing that the substance is something other than cocaine — such a result reveals nothing of special interest. Congress has decided — and there is no question about its power to do so — to treat the interest in ‘privately
 
 [3]
 
 possessing cocaine as illegitimate; thus governmental conduct that can reveal whether a substance is cocaine, and no other arguably ‘private’ fact, compromises no legitimate privacy interest.”
 

 In this case, after being contacted by Geek Squad employees and viewing file names that appeared to indicate that the files contained child pornography, the officers opened the file or files in question to determine whether they actually contained child pornography. A person does not have a constitutional right to possess child pornography in his home.
 
 See Perry v.
 
 
 *929
 

 State,
 
 568 So.2d 839 (Ala.Crim.App.1990). Also, in
 
 Ex parte Felton,
 
 526 So.2d 688, 639-41 (Ala.1988), the Alabama Supreme Court rejected a challenge to the constitutionality of Alabama’s Child Pornography Statute, § 13A-12-192, Ala.Code 1975, stating:
 

 “As pointed out in the opinion of the Court of Criminal Appeals, the Supreme Court of Ohio, in
 
 State v. Meadows,
 
 28 Ohio St.3d 43, 503 N.E.2d 697 (1986), was confronted with the same issue presented here; that court held that an Ohio statute, which criminalized the knowing, private possession of materials that showed a minor participating or engaging in sexual activity, masturbation, or bestiality, did not violate the First Amendment to the Constitution of the United States, as made applicable to the states by reason of the Fourteenth Amendment.
 

 “In
 
 Meadows,
 
 Chief Justice Cele-brezze, writing for a majority of the Court, stated:
 

 [[Image here]]
 

 ‘“To aid in our understanding of the state’s impetus for the eradication of child pornography through the banning of its possession, as well as the competing interests involved, we turn to the more recent Supreme Court pronouncement in
 
 New York v. Ferber
 
 (1982), 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113. Against a backdrop of public indignation over the proliferation of child pornography, the
 
 Ferber
 
 court defined a new category of unprotected speech. In contrast to
 
 Stanley, Ferber
 
 dealt specifically with child pornography, not obscenity involving only adults, and upheld the constitutionality of a criminal statute outlawing the promotion of sexual performances by minors through the distribution of material depicting such performances. As such, “the Court unanimously upheld a New York criminal statute that bans the distribution of nonobscene material depicting sexual conduct by children.” The decision essentially holds that states can constitutionally define the visual depiction of sexual conduct by children as obscenity without having to satisfy the threshold constitutional test for determining whether the material is obscene. The court ruled that the state’s “compelling” interest in eliminating child pornography was sufficiently great to allow the states to bypass the test for adult obscenity stated in
 
 Miller v. California
 
 (1973), 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419. Henceforth, states may automatically declare such visual depictions of sexual conduct by minors to be obscene and, as such, unprotected by the First Amendment. The
 
 Ferber
 
 court did not consider the propriety of state criminal sanctions concerning the final stage of the child pornography cycle, i.e., private possession. Nevertheless, the decision does touch on the competing interests involved in this case, [and] the court’s discussion of the state’s goals is instructive. In recognizing New York’s “compelling” interest of safeguarding the physical and mental well-being of its children, the court explained that “[t]he prevention of sexual exploitation and abuse of children constitutes a government objective of surpassing importance.”
 
 Id.
 
 458 U.S. at 757, 102 S.Ct. at 3355.
 

 “ ‘In this vein, the
 
 Ferber
 
 court set forth a number of important and legitimate state objectives accomplished by the eradication of child pornography. For instance, the court observed that “[t]he legislative judgment, as well as the judgment found in the relevant literature, is that the use of children as subjects of pornographic materials is harmful to the physiological, emo
 
 *930
 
 tional and mental health of the child.”
 
 Id.
 
 at 758, 102 S.Ct. at 3355. The
 
 Ferber
 
 court found that the existence of photographs “depicting sexual activity by juveniles is intrinsically related to the sexual abuse of children in at least two ways. First, the materials produced are a permanent record of the children’s participation and the harm to the child is exacerbated by their circulation. Second, the distribution network for child pornography must be closed if the production of material which requires the sexual exploitation of children is to be effectively controlled.”
 
 Id.
 
 at 759, 102 S.Ct. at 3355.
 

 “ ‘The court also discerned that state efforts directed at the banning of production would not adequately solve the dilemma. The hidden reality of the child pornography industry makes it “difficult, if not impossible, to halt the exploitation of children by pursuing only those who produce.... ”
 
 Id.
 
 at 759-760, 102 S.Ct. at 3356. In this regard, we note that the possessor’s desire to maintain depictions of child abuse also “providefs] an economic motive for and ... [is] thus an integral part of the production of such materials, an activity illegal throughout the Nation.”
 
 Id.
 
 at 761, 102 S.Ct. at 3356. A flourishing home market for such abusive materials will help guarantee that there will be additional victimization of children.
 
 Cf. id.
 
 at 761-762, fn. 13, 102 S.Ct. at 3357, n. 13.
 

 “ ‘Against these substantial overriding interests we believe that, like the promotion stage of the child pornography cycle addressed in
 
 Ferber,
 
 the value of permitting possession of “photographic reproductions of children engaged in lewd sexual conduct is exceedingly modest, if not de min-imis.”
 
 Id.
 
 at 762, 102 S.Ct. at 3357.
 

 “ ‘Unlike the obscene materials considered in
 
 Stanley, Miller,
 
 et al., child pornography involves, by its nature, the physical, mental and sexual abuse, seduction and harmful exploitation of children. The depictions ought to be banned by the state are but memorial-izations of cruel mistreatment and unlawful conduct. Additionally, such material would continue to exploit and victimize the- children shown by haunting them in the future.
 
 Ferber
 
 at 759, fn. 10, 102 S.Ct. at 3355, fn. 10. We believe the interest of the state in protecting the privacy, health, emotional welfare and well-rounded growth of its young citizens, together with its undeniable interest of safeguarding the future of society as a whole, comprise exactly the type of “compelling reasons” justifying a “very limited” First Amendment intrusion envisioned by the
 
 Stanley
 
 court. At the same time, the cost to the individual possessor’s right of free speech, privacy and thought, caused by the state’s banning of visual mementos from an episode of sexual abuse of a child, is slight. Moreover, the content value of such material is trifling and alternative means of simulation exist.’
 

 “Based upon the reasoning in
 
 Meadows,
 
 we are of the opinion that the judgment of the court of Criminal Appeals is due to be affirmed. The state’s interest in protecting the privacy, health, emotional welfare, and well-rounded growth of its citizens who are ‘under the age of 17 years,’ § 13A-12-192(b), together with its interest in safeguarding the future of society as a whole, are the type of ‘compelling reasons’ justifying a ‘ “very limited” First Amendment intrusion envisioned by the
 
 Stanley [v. Geor
 
 
 *931
 

 gia,
 
 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969),] Court.’
 
 [State
 
 v.]
 
 Meadows
 
 [, 28 Ohio St.3d 43, 503 N.E.2d 697 (1986) ].”
 

 Based on the purpose and goals underlying the statutes criminalizing the possession of child pornography, it is clear that, at the point when officers were looking at the file names on the computer, any expectation of privacy in files that had names that were highly suggestive of child pornography was not an expectation that society is prepared to recognize as reasonable. Also, Sellers testified that, if the files had contained adult pornography rather than child pornography, they would have closed the files and left. Therefore, any intrusion into potentially private matters would have been limited. Because there was no expectation of privacy that society was prepared to recognize as reasonable at the time officers viewed the names of the files, officers did not violate Fourth Amendment principles by viewing the contents of any of the files.
 

 For these reasons, the trial court properly denied Melton’s motion to suppress.
 

 III.
 

 Melton further argues that the trial court erroneously granted the State’s motion to amend the indictment against him. The original indictment alleged that he
 

 “did knowingly possess obscene matter containing a visual reproduction of a person under the age of 17 years engaged in an act of sado-masochistic abuse, sexual intercourse, sexual excitement, masturbation, genital nudity, or other sexual conduct, to-wit: numerous pictures of children and numerous videos of children, in violation of Section 13A-12-192(b) of the Code of Alabama, against the peace and dignity of the State of Alabama.”
 

 (C.R. 22.) Before trial, the State filed a motion to amend the indictment to include the allegation “that the alleged crime of Possession of Obscene Matter did occur on or about July 21, 2004 through September 8, 2005.” (C.R. 55.) The trial court granted the motion to amend over Melton’s objection.
 

 “The court may permit a charge to be amended without the defendant’s consent, at any time before verdict or finding, if no additional or different offense is charged and if the substantial rights of the defendant are not prejudiced.”
 

 Rule 13.5(a), Ala. R.Crim. P.
 

 “ ‘The element of prejudice to the “substantial rights of the defendant” is usually interpreted as requiring some showing of surprise which will interfere with the defendant’s presentation at trial.’ [2] LaFave & Israel,
 
 Criminal Procedure
 
 § 19.2(g) at 462 [1934].”
 

 Pace v. State,
 
 652 So.2d 321, 327 (Ala. Crim.App.1994).
 

 In this case, the amendment of the indictment did not result in an additional or different offense being charged. Further, other than general allegations, Melton has not shown that the amendment prejudiced his substantial rights.
 
 [3]
 
 Therefore, he is not entitled to relief as to this claim.
 

 IV.
 

 Finally, Melton argues that the State did not present sufficient evidence to
 
 *932
 
 support his conviction. Although he couches his argument in terms of the sufficiency of the evidence, his contentions actually address only the weight of the evidence.
 

 “ ‘ “[T]he
 
 ‘weight
 
 of the evidence’ refers to ‘a determination [by] the trier of fact that a greater amount of credible evidence supports one side of an issue or cause than the other.’ ”
 
 Tibbs v. Florida,
 
 457 U.S. [31] at 37-38 [102 S.Ct. [2211] at 2216] [ (1982) ] (emphasis added).’ ”
 

 Zumbado v. State,
 
 615 So.2d 1223, 1240 (Ala.Crim.App.1993) (quoting
 
 Johnson v. State,
 
 555 So.2d 818, 820 (Ala. Crim.App. 1989)).
 

 “The issue of the weight of the evidence is preserved by a motion for a new trial, stating ‘that the verdict is contrary to law or the weight of the evidence.’
 
 See
 
 [Ala.] R. Cr. P. 24.1(c)(1).”
 

 Zumbado,
 
 615 So.2d at 1241. Melton did not file a motion for a new trial challenging the weight of the evidence. Therefore, his argument is not properly before this court.
 

 For the above-stated reasons, we affirm the trial court’s judgment.
 

 AFFIRMED.
 

 WELCH, WINDOM, KELLUM, and MAIN, JJ., concur.
 

 [1]
 

 . Woods testified that the Geek Squad "is primarily an in-house and in-home computer support task force” at Best Buy. (R. 101.)
 

 [2]
 

 . On appeal, Melton does not argue that the law enforcement officers were not justified in seizing the computer and removing it from the Best Buy store because they did not first obtain a warrant and because no exigent circumstances existed at that time. Rather, he merely argues that the seizure and the subsequent forensic analysis of the computer were tainted by the allegedly improper initial search conducted by law enforcement officers. Therefore, we need not address the propriety of the officers' actions in seizing the computer and removing it from the Best Buy store.
 

 [3]
 

 . Although Melton makes additional assertions in his brief to this court, " ' "[t]his court is bound by the record and not by allegations or arguments in brief reciting matters not disclosed by the record.”
 
 Moore v. State,
 
 457 So.2d 981, 989 (Ala.Cr.App.1984), cert. denied, 470 U.S. 1053, 105 S.Ct. 1757, 84 L.Ed.2d 820 (1985).’
 
 Garnett v. State,
 
 555 So.2d 1153 (Ala.Crim.App.1989).”
 
 Similton v. State,
 
 672 So.2d 1363, 1366 (Ala.Crim.App. 1995). Therefore, we will not consider those assertions.